**Florangel RODRIGUEZ, Plaintiff,**

v.

**The CITY OF NEW YORK, The New York City Health and Hospitals Corporation, Eileen Sweeney, M.D., personally, and Douglas Lee, personally, Defendants.**

**No. 93 Civ. 122 (KMW).**

United States District Court, S.D. New York.

Aug. 24, 1994.

William M. Brooks, Mental Disability Law Clinic, Huntington, NY, for plaintiff.

R. Townsend Davis, Jr., Asst. Corp. Counsel, Paul A. Crotty, Corp. Counsel, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiff was involuntarily admitted to and confined at Bellevue Hospital. She sues the City of New York, the New York City Health and Hospitals Corporation, and two individual doctors, alleging violation of her constitutional rights pursuant to 42 U.S.C. § 1983 and pendent state law negligence claims. The doctors move for partial summary judgment on plaintiff's constitutional claims. Plaintiff cross-moves for partial summary judgment. For the reasons stated below, defendants' motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

## Background

The following facts are undisputed. On May 25, 1991, plaintiff Florangel Rodriguez was examined at Bellevue Hospital ("Bellevue" or "the hospital") by defendant Dr. Eileen Sweeney, a second-year resident at the hospital. On the basis of this examination, and on information obtained from plaintiff's roommate, Dr. Sweeney concluded that plaintiff should be admitted involuntarily to Bellevue on an emergency basis, pursuant to New York Mental Hygiene Law (hereinafter "MHL") § 9.39 (McKinney 1985). Plaintiff was retained at Bellevue overnight and examined the next day by defendant Dr. Douglas Lee. As a result of his examination, Dr. Lee concurred in Dr. Sweeney's conclusion that plaintiff should be involuntarily admitted to the hospital. Plaintiff was kept and treated at Bellevue until May 28, when she was examined by another doctor and released. During her stay at the hospital, the drug Mellaril was administered to plaintiff.

The parties offer differing versions, however, of the doctors' examinations and the events surrounding plaintiff's confinement. Dr. Sweeney states that she examined plaintiff for approximately an hour and twenty minutes. Defs.' 3(g) at ¶ 8. Dr. Sweeney's notes of the examination, Def.'s Notice of Motion Ex. D at 13, state that plaintiff was brought to the hospital by her roommate because plaintiff had been unable to eat or sleep for two weeks. *Id.* The notes state that plaintiff was "tearful and sobbed loudly throughout most of the interview," *id.*, that she appeared "depressed" and "anxious," and that she was "very tangential at times" and "unable to give clear answers to questions." *Id.* at 14. According to the notes, plaintiff provided the following information about herself: Plaintiff had been depressed "since 1990, when her marriage was annulled" and her ex-husband returned to Greece. *Id.* When plaintiff returned home to Venezuela after the annulment, her family was not supportive of her and was "more interested in the things I brought with me from America than in me." *Id.* Plaintiff returned to the United States and spent some time with her brother in Houston and friends in Indiana. She reported being depressed throughout

this period. *Id.* Eventually, plaintiff came to New York and took a secretarial job in a bank. The section of Dr. Sweeney's notes labelled "family history" states that plaintiff's brother and two sisters had made suicide attempts or gestures by taking overdoses of sleeping pills. *Id.* at 14. Approximately eleven years ago in Venezuela, Dr. Sweeney noted, plaintiff saw a psychologist three times because she was depressed. *Id.* at 13.

Dr. Sweeney recorded that plaintiff reported that "her job performance is poor because of her impaired concentration" and that "co-workers had noticed this." *Id.* According to the notes, plaintiff told Dr. Sweeney, "nothing makes me happy." *Id.* The notes state that plaintiff "admits to positive suicidal ideation. Says she doesn't care if car hits her while she is crossing the street. No clear suicidal plan at present, but says she wishes she would die." *Id.* Dr. Sweeney's notes also reflect information about plaintiff's recent behavior at home, obtained by telephone from plaintiff's roommate, Rosario Medina. Ms. Medina told Dr. Sweeney that, since moving in five weeks ago, plaintiff had not slept during the night, spent a lot of time in the bathroom at night, had daily crying episodes, did no household chores, and never wanted to go out. *Id.* According to the notes, plaintiff told Ms. Medina that she thought God had sent plaintiff to Ms. Medina because he thought Ms. Medina could help plaintiff. *Id.* Dr. Sweeney's preliminary diagnosis was that plaintiff was suffering from a "major depression with psychotic features." *Id.* at 14; Sweeney Dep. at 32. Dr. Sweeney concluded that plaintiff was "very depressed, unable to care for herself and expressing positive suicidal ideation/intent as well as vague paranoid ideation. She is a potential danger to herself and would benefit from hospitalization." *Id.* at 14.

Dr. Sweeney states that, after deciding to admit plaintiff, she presented plaintiff with a "Notice of Right to Appeal" and a "Notice of Status and Rights—Involuntary Status," forms notifying plaintiff of her right to appeal the decision, and providing her with information about Mental Hygiene Legal Services, an independent agency that provides protection to involuntarily hospitalized persons. Defs.' 3(g) at ¶¶ 45, 46. According to Dr. Sweeney, plaintiff declined to sign the Notice of Appeal, and never availed herself of the appeals process. Sweeney Dep. at 76–77.

Plaintiff claims that she went to Bellevue because Ms. Medina told her that she could obtain free sleeping medication from the hospital. When she arrived at Bellevue, she was told that she could not obtain medication without being examined by a doctor, and was thereafter examined by Dr. Sweeney. Pl.'s 3(g) at ¶ 4. Plaintiff alleges that Dr. Sweeney examined her for only 20 minutes. *Id.* at ¶ 3. According to plaintiff, much of the information recorded in Dr. Sweeney's notes is exaggerated or untrue. For example, plaintiff states that she never told Dr. Sweeney that she had not been able to eat or sleep for two weeks. Rather, plaintiff contends that she told Dr. Sweeney that she was having difficulty eating and sleeping at home for the past week because of stress created by her roommate, Ms. Medina. Pl.'s Aff. at ¶ 6. According to plaintiff, Ms. Medina had been acting unreasonably toward her, demanding that plaintiff clean up the kitchen after cooking, but before sitting down to eat, and insisting that she clean the bathtub every time she took a shower. Plaintiff claims that Ms. Medina would "yell and become upset over inconsequential matters," and that this behavior had made it difficult for plaintiff to eat and sleep at home. Plaintiff claims that she had no difficulty eating outside of her home. *Id.* at ¶ 10. Similarly, plaintiff claims that she did not lose interest in daily activities and household chores as Dr. Sweeney's note records Ms. Medina as saying; rather, plaintiff continued to perform household chores but would not accede to Ms. Medina's unreasonable demands. *Id.* at ¶ 11.

Plaintiff also states that she never told Dr. Sweeney that her brother and two sisters had made suicide attempts; rather, she told Dr. Sweeney that her brother and one of her sisters had each taken an overdose of sleeping pills, but that these were not genuine suicide attempts. *Id.* at ¶ 18. Plaintiff states that she did not say "nothing makes me happy;" instead, she said that the past year "was not a happy time." *Id.* at ¶ 13. Plaintiff claims that she never reported being

"depressed," only "sad." *Id.* at ¶ 9. According to plaintiff, she did not tell Dr. Sweeney that her family cared more about the things she had brought from America than they did about plaintiff. Rather, she told Dr. Sweeney that one member of her family appeared more interested in the things she had brought from America than in her, and that she received less support from her entire family than she would have liked. *Id.* at ¶ 10. Plaintiff states that she told Dr. Sweeney that her job performance "had declined" and that she was afraid her coworkers would notice if the decline continued, not that her job performance was poor and that coworkers had noticed. *Id.* at ¶ 15. Plaintiff concedes that she cried during the interview, but claims that this is because she was aware that she was at risk of involuntary hospitalization, and because Dr. Sweeney raised a number of painful topics. *Id.* at ¶ 20. Plaintiff denies saying that she did not care if a car ran over her when she crossed the street and that she wished she would die. Plaintiff contends that this information must have been provided by Ms. Medina, and alleges that Dr. Sweeney accepted it as true without verification. *Id.* at ¶ 12. Dr. Sweeney disagrees, stating that plaintiff herself made the statements. Sweeney Dep. at 31.

Plaintiff also contends that Dr. Sweeney refused to listen to information that two other persons wished to provide about plaintiff. Plaintiff states that her sister arrived at the hospital after Dr. Sweeney's examination was completed, but before plaintiff's admission had been fully processed, and that Dr. Sweeney "was not interested" in speaking with her except to inform her of the decision to admit plaintiff. Pl.'s Aff. at ¶ 8. Later, Ms. Barbara Lerman, who describes herself as plaintiff's "American mother" and with whom plaintiff is now living, spoke with Dr. Sweeney from Indiana and offered to come to New York to get plaintiff and take plaintiff home with her to Indiana. Plaintiff alleges that Dr. Sweeney refused to speak at length with Ms. Lerman, failed to ask her for information regarding plaintiff, and ended the call by telling Ms. Lerman that she was "exhibiting histrionics." Lerman Aff. at ¶¶ 1–5.

Defendants and plaintiff also give differing accounts of plaintiff's interview with Dr. Lee, who examined plaintiff the day after she was involuntarily admitted. Dr. Lee's notes state,

> [Plaintiff] summarized stressors which she has experienced in the past year: annulled marriage to Greek friend, loss of job, disappointment in family, unfamiliarity with people in New York, unfamiliarity with new job, clashes with roommate (she was so critical "she reminded me of my mother"). And frequently this was interrupted by tears and crying.

Defs.' Notice of Motion Ex. D at 16. According to Dr. Lee's notes, plaintiff confirmed that she had been suffering from insomnia, loss of appetite, and decreased concentration, and described herself as "unable to read a book and comprehend/remember." *Id.* at 15. Plaintiff also confirmed, the notes state, that she was in a depressed mood, had lost energy, had suffered a decrease in job performance, and a loss of interest in pleasurable activities. *Id.* Dr. Lee's notes report that plaintiff denied having suicidal ideations on the day he examined her, but confirmed that she had expressed them the day before, saying, "Everyone thinks about it at one time or another." *Id.* at 15–16; Lee Dep. at 49. Dr. Lee concluded that plaintiff was suffering from "major depression." His notes state, "Patient without significant change since yesterday, although no signs of psychosis and denies suicidal ideation. However, patient has prominent major depressive symptoms by history as well as on mental status exam." Dr. Lee recommended that plaintiff's involuntary admission be confirmed.

Plaintiff contends that Dr. Lee examined her for ten minutes. She claims that Dr. Lee never spoke with her about a decrease in energy level, lack of concentration, decreased ability to function, or disappointment in family matters. Plaintiff states that she "told Dr. Lee what [she] told Dr. Sweeney." Pl.'s 3(g) at ¶ 86. Plaintiff contends that although she did tell Dr. Lee she was having difficulty reading and comprehending a book, this difficulty was due to medication prescribed by the hospital, and not to any difficulty she had prior to coming to Bellevue. Pl.'s Aff. at

¶ 26. Plaintiff alleges that she never told Dr. Lee that she had said that she did not care whether a car hit her on the day before. Plaintiff denies that her interview with Dr. Lee was frequently interrupted by crying.

Finally, defendants' account of plaintiff's treatment with the drug Mellaril differs from that of defendants. Plaintiff alleges that on May 25, 1991, Dr. Sweeney prescribed the antipsychotic medication Mellaril for plaintiff, without telling plaintiff that the medication had been prescribed and the reasons for its prescription, and without informing plaintiff of the known risks and benefits of the drug. Pl.'s 3(g) at ¶¶ 7–8. Plaintiff alleges that the hospital staff administered the medication on May 25, 26, and 27, also without providing her with the aforementioned information. According to plaintiff, she suffered a serious negative reaction to the medication, including palpitations, tremors, dizziness, blurred vision and faintness. *Id.* at ¶ 18. Plaintiff claims that she would have refused the medication had she known of the possible side effects. Defendants, in contrast, state that the custom of hospital personnel is to inform patients that they are about to receive medication, to identify the medication, and to explain the intended purposes and possible side effects of the medication. Defs.' 3(g) at ¶¶ 8, 10, 17, 20. Dr. Sweeney and the nurses who administered Mellaril to plaintiff allege that they adhered to their usual practice in treating plaintiff. *Id.* Defendants also deny that plaintiff suffered an adverse reaction to her medication, and state that, when plaintiff complained of not feeling well on May 27, 1991, she was examined by a doctor and found not to be in distress. *Id.* at 18. No adverse reaction is recorded in plaintiff's hospital records. See Defs.' Notice of Motion Ex. D.

On January 11, 1993, plaintiff filed this lawsuit. Plaintiff's first, second, fifth, and sixth causes of action raise claims pursuant to 42 U.S.C. § 1983 and state law arising out of her involuntary admission to Bellevue.

Plaintiff alleges that defendants admitted her without properly making the determinations required by MHL § 9.39, and that this admission violated her right to procedural and substantive due process (plaintiff's first and second claims, respectively). In addition, plaintiff alleges that defendants mistakenly diagnosed her as suffering from major depression with psychotic features, and that, on the basis of this diagnosis, they made a treatment decision that fell below minimally accepted standards of professional judgment. Plaintiff claims that the alleged treatment decision violated her substantive right to due process (fifth claim) and constituted negligent diagnosis under state law (sixth claim). Plaintiff's third and fourth claims pertain to the administration of the drug Mellaril. Plaintiff alleges that defendants failed to inform her of the benefits, risks, and available alternatives to the drug, thereby subjecting her to treatment falling below minimally accepted professional judgment standards in violation of her due process rights (third cause of action). Plaintiff also alleges that the administration of Mellaril violated her right to informed consent pursuant to state law (fourth cause of action).[1] Finally, in her seventh cause of action, plaintiff seeks a declaratory judgment that she is not liable for the costs of her involuntary confinement. Plaintiff seeks compensatory damages, punitive damages, an injunction ordering the expunging of her hospital records, and the aforementioned declaratory relief. By an Order of the court dated July 20, 1993, with the consent of the parties, plaintiff's constitutional claims against the City of New York and the New York City Health and Hospitals Corporation were bifurcated from the rest of the action pursuant to Federal Rule of Civil Procedure 42(b), and related discovery was stayed pending resolution of the question of whether plaintiff's rights were violated. Defendants Sweeney and Lee then moved for summary judgment as to plaintiff's first, second, and fifth causes of action.[2] Plaintiff

---

**1.** Plaintiff's second, third, and fifth causes of action name only Drs. Sweeney and Lee. Her first, fourth, and sixth causes of action name both the doctors in their personal capacity and the City of New York and the New York City

Health and Hospitals Corporation. *See* First Amended Complaint.

**2.** On October 18, 1993, with the consent of the court, defendants filed an amended answer stating, as an affirmative defense, that plaintiff did

cross-moved for summary judgment on her first, third, and seventh claims.

### Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 710 (2d Cir.1991). The court's responsibility in deciding a summary judgment motion is not to resolve disputed issues of fact, *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues to be tried. When deciding a motion for summary judgment, a court must " 'resolve all ambiguities and inferences ... in the light most favorable to the party opposing the motion.'" *Shockley v. Vermont State Colleges,* 793 F.2d 478, 481 (2d Cir. 1986) (citations omitted).

### The Parties' Summary Judgment Motions on Plaintiff's First and Second Claims

Defendants' motion for summary judgment on plaintiff's substantive and procedural due process claims rests on two grounds. First, defendants argue that plaintiff has failed to raise an issue of triable fact as to whether the doctors complied with MHL § 9.39. Defendants correctly point out that in *Project Release v. Prevost,* 722 F.2d 960 (2d Cir. 1983), the Court of Appeals for the Second Circuit held that MHL § 9.39 meets both substantive and procedural due process requirements. Therefore, defendants contend, if Drs. Sweeney and Lee fully complied with MHL § 9.39, plaintiff's constitutional claims must fail, and the doctors are entitled to win as a matter of law. Def. Mem. at 10. Second, defendants argue that even if they did not comply with MHL § 9.39, Drs. Sweeney and Lee are entitled as a matter of law to qualified, good faith immunity as to plaintiff's substantive and procedural due process claims.

Plaintiff cross-moves for partial summary judgment on the issue of defendants' compliance with MHL § 9.39. Arguing that the mandatory language of MHL § 9.39 creates a liberty interest in freedom from involuntary hospitalization except upon the occurrence of behavior specified in the statute, Pl.'s Mem. at 6–8, plaintiff contends that plaintiff's conduct did not rise to the level of the specified behavior, that defendants failed to comply with MHL § 9.39 as a matter of law, and that therefore plaintiff's due process rights were violated. Although plaintiff's Notice of Motion indicates that she moves for summary judgment on her substantive due process claim only, her memorandum of law appears to argue for summary judgment on the procedural due process claim as well. Pl.'s Mem. at 9. Indeed, at several points in plaintiff's submissions, her argument makes it difficult to distinguish between her substantive and her procedural due process claims.[3] I need not determine the precise scope of plaintiff's summary judgment motion, however, or attempt to disentangle her substantive and procedural due process claims, because I hold that defendants' actions complied with MHL § 9.39 as a matter of law, and thereby satisfied the demands of both substantive and procedural due process.

### A. Whether defendants complied with MHL § 9.39

MHL § 9.39 provides in pertinent part:

The director of any [qualified] hospital ... may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which

---

not file a notice of claim with the director or officer of the New York City Health and Hospitals Corporation within 90 days of the accrual of the claim, pursuant to New York law. In a letter dated November 17, 1993, "so ordered" by the court, plaintiff conceded that the failure to file a notice of claim barred the sixth cause of action, and accordingly, withdrew that claim.

**3.** For example, although plaintiff argues that MHL § 9.39 creates a liberty interest the violation of which infringes substantive due process, she also treats MHL § 9.39 as the constitutionally mandated procedure without which such a deprivation of liberty may not take place. In short, both plaintiff's substantive and procedural due process claims amount to the argument that defendants violated MHL § 9.39.

immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.

"Likelihood to result in serious harm [to himself]" is defined to mean "substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself." MHL § 9.39(a). The statute provides that the director of a hospital shall admit the person only if a staff physician upon examination finds that the person qualifies under the statute. The person may not be retained for more than forty-eight hours unless the finding is confirmed by another staff physician. MHL § 9.39(a).

Defendants argue that their actions complied with the statute as a matter of law. They note that it is uncontested that Drs. Sweeney and Lee determined that plaintiff had a "mental illness." It is also undisputed that the doctors concluded that plaintiff posed a "substantial risk of harm to herself." Plaintiff's hospital records report statements suggesting that plaintiff was thinking about suicide, as well as "other conduct" from which the doctors concluded that plaintiff posed a danger to herself. These facts do not necessarily entitle defendants to judgment as a matter of law, however, because plaintiff disputes some of the alleged facts on which defendants' medical conclusion was based. Summary judgment is appropriate only if this dispute is not "material" to the resolution of plaintiff's claim. Whether the dispute is material, in turn, depends on whether, taking plaintiff's allegations as true and resolving all ambiguities in her favor, plaintiff exhibited "threats of ... suicide or serious bodily harm ... or other conduct demonstrating that [plaintiff] is dangerous to [herself]" within the meaning of MHL § 9.39. Thus, the resolution of defendants' summary judgment motion requires interpretation of the language of MHL § 9.39.

Plaintiff's motion for partial summary judgment on her first claim also requires interpretation of MHL § 9.39. Plaintiff argues that, as a matter of law, her statements to defendants and her behavior at Bellevue did not amount to "threats of suicide" or "other conduct demonstrating that [she] was dangerous to herself" within the meaning of MHL § 9.39, and therefore that the court must find that defendants violated the statute. The court may grant plaintiff's motion only if, taking defendants' allegations as true and making all inferences in favor of defendants, the court concludes that plaintiff did not exhibit "threats of suicide" or "other conduct demonstrating that [plaintiff] is dangerous to [herself]" within the meaning of MHL § 9.39. Therefore, the resolution of both summary judgment motions turns on the meaning of the statute.

Because I hold below that plaintiff exhibited "conduct demonstrating that [plaintiff] is a danger to herself" within the meaning of the statute, I do not address the statutory meaning of "threat[ ] of suicide," and I express no view as to whether plaintiff made a "threat of suicide" as contemplated by the statute.

### 1. The meaning of MHL § 9.39

■ In *O'Connor v. Donaldson*, the United States Supreme Court held that "a state cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members." 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). Courts interpreting MHL § 9.39 have found the statute constitutional on its face because it requires that a finding of "substantial risk of physical harm to self or others" be made by a staff physician before an individual may be involuntarily committed to a hospital on an emergency basis. *Project Release v. Prevost*, 722 F.2d 960, 973 (2d Cir.1983) (hereinafter *Project Release II* ); *Matter of Scopes v. Shah*, 59 A.D.2d 203, 398 N.Y.S.2d 911, 913 (3d Dep't 1977). As interpreted by the Second Circuit Court of Appeals, MHL § 9.39 requires that this finding may not be based "solely on medical diagnosis, but instead require[s] that the potential for serious harm be *objectively* 'manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that [the patient] is a danger to himself....'" *Project Release v. Prevost*, 551 F.Supp. 1298, 1305 (E.D.N.Y.1982), *aff'd*,

*Project Release II,* 722 F.2d 960 (emphasis added); *see also Project Release II,* 722 F.2d at 972 (MHL § 9.39 "require[s] some affirmative 'overt' conduct by the individual before involuntary commitment may be imposed.").[4] However, the statutory bases for the finding of dangerousness are not entirely independent of medical judgment; determining whether an individual has made a "threat of suicide," or whether conduct that is manifested by the individual "demonstrat[es] that he is a danger to himself" requires a physician to make a medical decision, guided by standards that are generally accepted within the medical community.

Recognizing that the interpretation of MHL § 9.39 would be critical for the resolution of the parties' summary judgment motions, and noting that the meaning of the statute depends in part on the understanding of the terms "threat of suicide" and/or "conduct demonstrating that a person is a danger to himself" within the medical community, the court ordered an evidentiary hearing on this issue pursuant to Federal Rule of Civil Procedure 43(e).[5] Each party presented an expert who testified to, and was cross-examined on, the generally accepted meaning of the two relevant terms in the medical community. To summarize briefly, plaintiff's expert offered a narrow definition of "conduct demonstrating that a person is a danger to himself," as "complex motor behavior that puts that person directly at risk of harming herself or himself." Tr. at 18–19. Plaintiff's expert stated that such conduct is "generally under volitional control." Tr. at 18. His examples were buying a gun in preparation to harm oneself, jumping off a ledge, walking in front of a car (in certain circumstances); or starving oneself to death. Tr. at 19–20, 67, 82. Plaintiff's expert rejected the possibility that lack of concentration, depressed

mood, crying, anxiety, or insomnia are "conduct" at all. Tr. at 24–25, 42. Rather, plaintiff's expert asserted, these are "symptoms of mental illness." Tr. at 24–25.

Defendants' expert disagreed with the distinction between "conduct" and symptoms of mental illness, ultimately defining conduct as any "behavior" exhibited by a patient, including mental or emotional behavior. Tr. at 129, 133. Under defendants' expert's definition, "conduct demonstrating that an individual is a danger to herself" comprises a wide range of such behavior, both voluntary and involuntary, including: an attempt to obtain something that could be used to commit suicide, Allen Aff. at ¶ 7; symptoms of mental illness described or manifested to an admitting psychiatrist, such as depressed mood, failure to eat or sleep, reduced work performance, crying, and anxiety, Tr. at 137; Allen Aff. at ¶ 7; performance on a mental status exam, including an individual's assessment of her own mood, her composure, her speech patterns, and her response to the examiner, Tr. at 125, 136; past psychiatric history, Tr. at 137; and reaction to social stressors, such as a death in the family or a divorce, Tr. at 135–36, 155. Defendant's expert emphasized that there is no single factor or combination of factors which efficiently predicts risk of suicide, Tr. at 103, and that an accurate assessment of dangerousness requires an assessment of a wide range of data. To forbid a psychologist to consider all of this data, defendants' expert stated, would lower the quality of the assessment. Tr. at 139. When pressed, plaintiff's expert appeared to agree that consideration of a wide range of data is necessary in assessing the risk of suicide. Tr. at 70–71.

Defendants' expert also testified that the likelihood of suicide is not clearly correlated with the kind of behavior that falls into plain-

---

**4.** Although the language of the decisions is somewhat confusing, both the Court of Appeals for the Second Circuit and the District Court for the Eastern District of New York draw a distinction between requiring some "objective manifestation" or "affirmative overt conduct" as the basis for the statutory determination of dangerousness, and requiring a "recent overt act" demonstrating immediate dangerousness, such as a suicide attempt, or, for persons dangerous to others, an act of hostility. *Project Release II,* 722 F.2d at 972–

74; *Project Release I,* 551 F.Supp. at 1304–05. *See also Scopes,* 398 N.Y.S.2d at 913. I address the question of whether MHL § 9.39 contains an "overt act" requirement *infra* p. 1182.

**5.** The court also requested supplemental affidavits from the parties' witnesses in the form of a response to questions by the court. *See* Pl.'s Response to Questions (hereinafter "Pl.'s Resp.); Allen Aff.

tiff's expert's narrow definition of "conduct." For example, he stated that people who make unsuccessful suicide attempts are not at high risk for successful completion of suicide. Tr. at 119. In contrast, defendants' expert stated, depression is highly correlated with suicide. Tr. at 115, 119; Allen Aff. at ¶ 13. Defendants' expert testified that, over a period of ten years, only 1% of those who make a suicide attempt successfully complete suicide, Tr. at 115, whereas 15% of persons who suffer from depression successfully commit suicide over the same period, Tr. at 118, and 40% of successful suicides have a diagnosis of depression. Tr. at 115. *See also* Def.'s Ex. B. Plaintiff's expert did not dispute this data. The two experts agreed that, in any assessment of dangerousness, the significance of any conduct by plaintiff depends upon the context in which it appears and the background information possessed by the evaluating physician. *See, e.g.,* Tr. at 66, 109, 132, 155. Factors that both experts acknowledged may be relevant in an assessment of dangerousness include such things as a patient's living situation, the availability of social support, family history, and whether a patient has recently experienced a loss. Tr. at 69–70; Pl.'s Resp., *passim;* Allen Aff. at ¶ 9.

■ After careful consideration of the expert witnesses' opinions, I conclude that defendants' expert's broader understanding of "conduct demonstrating that a person is a danger to herself" more closely comports with the controlling decisional law and the language and purpose of MHL § 9.39. Plaintiff asks the court to construe "conduct demonstrating that a person is dangerous to herself" to include only complex and volitional motor behavior that places the individual directly at risk of harming herself. *See* Tr. at 18–19 and *supra* p. 1181. From the examples offered by plaintiff's expert, I understand plaintiff to include in this definition only discrete acts, akin to suicide attempts, that pose an immediate threat of serious bodily harm. Adopting this definition would compel the court to hold that MHL § 9.39 contains what has been called a "recent overt act" requirement, an interpretation that has been explicitly rejected by courts construing MHL § 9.39 and its companion sections.

In *Project Release I,* 551 F.Supp. 1298, the District Court for the Eastern District of New York considered whether "proof of imminent danger, demonstrated by a recent overt act, must support any civil commitment" before that commitment comports with due process requirements. The decision concerned the constitutionality of MHL § 9.39, not its construction, but the court necessarily interpreted the statute in order to determine whether it was constitutional on its face. Concluding that the statute did not contain a "recent overt act" requirement, the court held:

> The New York statute is not facially unconstitutional simply because it fails to require that an overt act be shown in support of every civil commitment.... An impartial factfinder, guided by medical documentation, should be permitted to determine that mental illness is present and danger likely without waiting for an individual's conduct to make serious harm all but inevitable.

551 F.Supp. at 1305. The Second Circuit Court of Appeals affirmed, stating, "We are not convinced that, as a practical matter, the addition of a recent overt act requirement would serve to reduce erroneous confinements...." *Project Release II,* 722 F.2d at 973. *Cf. Scopes v. Shah,* 398 N.Y.S.2d at 913 (requirement that threat of substantial harm be evidenced by recent overt act, attempt or threat is too restrictive and not necessitated by substantive due process).

Moreover, plaintiff's narrow definition runs counter to the language and purpose of the statute. The phrase "other conduct demonstrating that a person is dangerous to herself" implicitly defers to medical judgment by requiring the admitting physician to interpret whether conduct exhibited by an individual poses a significant risk of harm to self or others. To be sure, this interpretation must be based on something that falls into the category of "conduct." Within this limit, however, "conduct demonstrating that a person is a danger to herself" must be interpreted in a way that enables an examining physi-

cian to make the determination of dangerousness required by the statute.[6]

Although the parties' experts disagreed on the meaning of the statutory language, they agreed that an assessment of dangerousness requires consideration of a variety of factors, including the individual's bearing during a mental status exam, reported state of mind, symptoms of mental illness, suicidal thoughts, plans or attempts, social stressors, psychiatric history, and family history. In light of this agreement, and in light of undisputed testimony as to the lack of correlation between overt acts suggesting immediate danger and completed suicides, I conclude that to adopt plaintiff's definition of "conduct" would foreclose a physician from considering factors that, in some contexts, demonstrate that an individual poses a very high risk of suicide, despite the lack of a "recent, overt act" suggesting imminent danger. That is, to adopt plaintiff's interpretation of "conduct" would be to interpret MHL § 9.39 in a way that prevents an admitting physician from accurately making the very assessment of dangerousness that the statute requires. I do not believe that this is what the New York legislature intended. *See Rubenstein v. Benedictine Hospital,* 790 F.Supp. 396, 441 (N.D.N.Y.1992) (requirement of § 9.39 satisfied where plaintiff was diagnosed with paranoid schizophrenia and nurse told admitting physician that plaintiff was "unable to sleep, confused and paranoid, reading and underlining the Bible, reading books on Hitler and women murderers, bizarrely dressed, hyperactive, swearing and denying any problems."); *dePoel v. City of New York,* 772 F.Supp. 106, 107–08 (E.D.N.Y.1991) (finding of dangerousness properly made under § 9.39 where one doctor's notes stated that plaintiff was "disorganized, unkempt, grossly delusional, paranoid, unable to take care of herself or house," and second doctor's notes stated "yes" to printed question, "does patient show a tendency to injure himself?").

Of course, the mere fact that a psychologist looks to a datum to assess risk of suicide does not make that datum count as "conduct." It would stretch the plain meaning of the language, for example, to include family history or social stressors, independent from an individual's reaction to them, in the category of "conduct." However, I accept the testimony of both defendants' expert and plaintiff's expert that family history and social stressors may be relevant in making the interpretation of an individual's conduct that MHL § 9.39 demands. I conclude that the term "conduct demonstrating that a person is dangerous to herself" as it is used in MHL § 9.39 incorporates a wide range of behavior, both physical and emotional, that is objectively manifested or reported to an admitting physician, including the following: an attempt to obtain something that can be used to commit suicide; a failure to eat or sleep; crying; depressed mood; anxiety; and failure to concentrate. *See Rubenstein,* 790 F.Supp. at 441; *dePoel,* 772 F.Supp. at 107–08. A physician comports with MHL § 9.39 if he or she makes a finding of "substantial risk of harm to self or others" based on such conduct, interpreted in light of the context in which it is exhibited and the background information available to the physician.

### 2. The application of MHL § 9.39 to plaintiff

Applying the statute to defendants' actions, I conclude that, even taking all plaintiff's allegations as true and resolving all ambiguities in plaintiff's favor, a reasonable jury must conclude that defendants made a finding of a "substantial risk of harm" to plaintiff based on "conduct demonstrating that she was dangerous to herself," and thus that defendants complied with the statute. Plaintiff's most substantial factual disputes with defendants are her contentions that she

---

**6.** This approach to interpreting the statute is consistent with the traditional deference granted to physicians by the United States Supreme Court in the making of medical judgments. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 608, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979) (mode and procedure of medical diagnostic procedures is not the business of judges); *Addington v. Texas,* 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979) (whether a person is mentally ill turns on the meaning of facts which must be interpreted by psychiatrists and psychologists); *Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982). Deference to medical judgment requires that physicians be permitted to consider factors that the medical community accepts as relevant in the making of such judgments.

never told Dr. Sweeney that she didn't care whether a car ran over her and that she wished she would die, and that she never admitted making these statements when she spoke with Dr. Lee.[7] These disputes are not material, however, because the alleged statements can be disregarded in assessing whether plaintiff's conduct demonstrated that she was a danger to herself. Plaintiff's other disagreements with defendants are matters of emphasis rather than outright denials. For example, plaintiff concedes that she engaged in the following conduct falling within the meaning of MHL § 9.39: that she came to Bellevue to get sleeping pills, something that could be used to commit suicide; that she had recently had trouble eating and sleeping; that her performance at work had declined; that she cried during her interview with Dr. Sweeney; that she was "sad" and had been so for the past year, which was "not a happy time." She also concedes the following background information against which Drs. Sweeney and Lee were entitled to interpret that conduct: her marriage had been annulled within the past year; she was experiencing a stressful relationship with her roommate; her entire family was not as supportive as she would have liked; a brother and a sister had previously taken overdoses of sleeping pills. Finally, plaintiff concedes that defendants concluded that she posed a "substantial risk of harm to [her]self," on the basis of this data. MHL § 9.39; see Defs.' 3(g) at ¶¶ 38, 75; Pl.'s 3(g) at ¶¶ 24, 50. Plaintiff disagrees with defendants' conclusion that she posed a likelihood of substantial harm to herself. However, the statute does not require that a physician's assessment of the likelihood of serious harm be correct; it requires only that the assessment be made on the basis of criteria that are specified in the statute. Defendants meet this standard here. I therefore grant defendants' motion for summary judgment as to plaintiff's first and second claims, and deny plaintiff's motion for partial summary judgment as to her first claim.

## B. Whether Defendants are Entitled to Qualified Immunity

 Even if defendants were not entitled to summary judgment as to plaintiff's first and second claims on the ground that they complied with MHL § 9.39 as a matter of law, they are entitled to qualified good faith immunity from suit by plaintiff. Qualified immunity shields state actors from actions for civil damages alleging violations of federal law, if their conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because qualified immunity "is an immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, summary judgment is favored when a qualified immunity defense is asserted in order to "eliminate meritless actions against public officials at the earliest possible stage in the litigation." Glass v. Mayas, 794 F.Supp. 470, 473 (E.D.N.Y.1992), aff'd, 984 F.2d 55 (2d Cir.1993) (citing Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817–18). See also Harlow, 457 U.S. at 816–18, 102 S.Ct. at 2737–38; Cartier v. Lussier, 955 F.2d 841, 844 (2d Cir.1992).

 Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the " 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 817–18, 102 S.Ct. at 2737–38). "The contours of the right must be sufficiently clear that a reasonable official

---

**7.** Plaintiff concedes that these statements appear in Dr. Sweeney's notes. Her explanation is that the statements must have been supplied by plaintiff's roommate, Ms. Medina. The court notes that, under New York law, defendants are entitled to rely on information reported by others in making their assessment of dangerousness. See Rubenstein, 790 F.Supp. at 399, 411 (doctors apparently relied on reports of plaintiff's conduct by plaintiff's mother). I do not rest my conclusion on this principle, however, but on the presence of undisputed facts in the record showing that plaintiff exhibited conduct demonstrating that she was a danger to herself within the meaning of the statute.

would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. When assessing a motion for summary judgment on the issue of qualified immunity,

> a court should ask whether, viewing the evidence in the light most favorable to the non-moving party, the conduct that may be proved at trial is conduct that, at the time it occurred, violated a clearly established constitutional or statutory right. If the answer is no, the court should grant a defendant's motion for summary judgment.

*Mozzochi v. Borden,* 959 F.2d 1174, 1178 (2d Cir.1992) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2737–38). Here, where a statute that meets constitutional standards authorizes emergency commitment upon certain findings by admitting physicians, the question is whether defendants reasonably believed that their decision to admit plaintiff complied with the statute. *See Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir.1993) (availability of qualified immunity in context of emergency admission turns on "whether it was objectively reasonable for the defendants to believe, at the time they examined [plaintiff] and in light of the information they possessed, that [plaintiff] was dangerous" to herself).

■ Taking all plaintiff's allegations as true and resolving all ambiguities in favor of plaintiff, I conclude that it was objectively reasonable for defendants to believe that their decision to admit plaintiff complied with the statute, and that no reasonable jury could conclude otherwise. As discussed at greater length above, plaintiff does not dispute that she cried during her interview with Dr. Sweeney, or that she reported sadness, reduced work performance, and difficulty eating and sleeping. Undisputed testimony established that these are symptoms of depression, a mood disorder that is highly correlated with suicide. Plaintiff also conceded that she reported an annulled marriage, lack of family support, and two siblings who had previously taken overdoses of sleeping pills. Most importantly, plaintiff came to the hospital to obtain sleeping pills, something that could be used to commit suicide. These undisputed facts provide a reasonable basis for the conclusion that plaintiff posed a substantial risk of harm to herself. Accordingly, defendants are entitled to summary judgment on the issue of qualified immunity.

## Defendants' Summary Judgment Motion as to Plaintiff's Fifth Claim

In her fifth cause of action, plaintiff claims that defendants incorrectly diagnosed plaintiff as suffering from major depression with psychotic features, and that, on the basis of this diagnosis, defendants made a "treatment decision" that fell below minimally accepted standards of professional judgment. Plaintiff alleges that this treatment decision, which is not specified in the First Amended Complaint, violated her right to due process under the Fourteenth Amendment. Defendants contend that because the only "treatment decisions" referred to in plaintiff's allegations are the decision to admit her and the decision to treat her with the drug Mellaril, plaintiff's fifth claim lacks a legal basis independent of her other causes of action, and must be dismissed for failure to state a claim upon which relief may be granted. I agree, insofar as plaintiff's fifth claim is based on the decision to admit her.

Plaintiff has already challenged the decision to admit her involuntarily on due process grounds, in her first and second causes of action. The fifth claim differs slightly from the first and second claims in that the fifth claim is framed as an argument that the decision fell below minimally accepted standards of professional judgment, whereas the first and second claims are expressed as an argument that defendants failed to comply with MHL § 9.39. However, because the Second Circuit Court of Appeals has determined that § 9.39 meets substantive and procedural due process standards, *Project Release II,* 722 F.2d 960, and because I have concluded as a matter of law that defendants complied with MHL § 9.39 in the admission of plaintiff to Bellevue, the question of whether plaintiff's involuntary admission violated her due process rights has been resolved. Insofar as plaintiff's fifth claim is based on her involuntary admission, therefore, it must be dismissed with prejudice.

Insofar as the fifth claim rests on the decision to administer the drug Mellaril to plaintiff, plaintiff's contentions are not clear. Plaintiff's third and fourth causes of action, the only ones explicitly arising out of the administration of Mellaril, allege that plaintiff was given the medication without adequate information about its purpose, its side effects, and the available alternatives. These allegations are discussed *infra*, and to the extent it relies on these allegations, plaintiff's fifth claim duplicates her third and fourth causes of action. However, plaintiff appears also to argue, in her memorandum of law, that the decision to *prescribe* Mellaril fell below minimally accepted standards of professional judgment. Plaintiff's fifth claim is so poorly articulated that it is impossible to determine whether she intends to bring such an allegation. Therefore, although I dismiss plaintiff's fifth claim, I do so without prejudice to her right to amend, provided she does so in a manner that is not duplicative of her other claims. *See Schueuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (claim should not be dismissed without leave to amend unless it is clear that there is no basis for relief).

### Plaintiff's Motion for Summary Judgment on the Third Claim

■ Plaintiff's third claim is that defendants failed to inform her of the benefits, risks and available alternatives to Mellaril, that they thereby subjected her to treatment falling below minimally accepted professional judgment standards, and that this treatment decision violated her due process rights. Plaintiff argues that she is entitled to summary judgment on her third claim because defendants have failed to raise a triable issue of fact as to whether plaintiff received sufficient information about the medication. The court disagrees.[8]

In response to plaintiff's claim, Dr. Sweeney submits an affidavit stating that her usual practice is to inform patients that they have been prescribed medication, to identify the medication, and to inform the patient of the medication's intended purpose and possible side effects. Sweeney Aff. at ¶ 4. Although Dr. Sweeney does not recall a specific conversation with plaintiff about Mellaril, she states that she has no reason to believe that she deviated from her usual practice. *Id.* at ¶ 5. Defendants also submit affidavits from Azucena Suravilla, Mary Ajibade, and Sarah Morton, the registered nurses who administered Mellaril to plaintiff. Although none of the nurses specifically recalls plaintiff, each of them states that her usual practice is to tell patients that they are about to receive medication, to identify the medication, and to inform patients of the medication's intended purpose and possible side effects. Suravilla Aff. at ¶ 5; Ajibade Aff. at ¶ 5; Morton Aff. at ¶ 5. Each nurse states that if a patient accepts a medication, the usual practice is to place the nurse's initials on the patient's chart in the column designating the time and date the medication was administered. Suravilla Aff. at ¶ 6; Ajibade Aff. at ¶ 6; Morton Aff. at ¶ 6. The nurses' initials duly appear on plaintiff's chart. Defs.' Reply 3(g) at Ex. A.

Plaintiff asks the court to conclude as a matter of law that the hospital staff failed to provide her with information about Mellaril's purpose and potential side effects, because none of them specifically recalls conversing with plaintiff about Mellaril. In deciding plaintiff's motion for summary judgment, however, I must accept all defendants' allegations as true and draw all reasonable inferences in defendants' favor. *Shockley*, 793 F.2d at 481. A reasonable jury could infer from evidence of the normal practices of hospital staff that those practices were in fact followed in plaintiff's case. For example, a jury could infer from the presence of a check mark on plaintiff's chart that the nurses informed plaintiff that Mellaril had been prescribed and told her of its purpose and possible side effects. The fact that Dr. Sweeney and the nurses do not specifically

---

8. The court notes that plaintiff cites no authority for the claim that failure to inform a patient of the risks, benefits and alternatives to a medication falls below minimally accepted standards of professional judgment. I need not address this issue, however, because I conclude that even if plaintiff's assumption were accepted, a factual dispute as to whether defendants provided the pertinent information, precluding judgment for plaintiff as a matter of law.

remember discussing Mellaril with plaintiff does not make such an inference unreasonable; indeed, it would be surprising if members of the hospital staff, who are responsible for hundreds of patients, remembered each brief discussion with each patient. Because defendants have created an issue of triable fact as to whether plaintiff received information about Mellaril's purposes, risks and alternatives, plaintiff's summary judgment motion must be denied.

### Plaintiff's Motion for Summary Judgment On the Seventh Claim

█ In her seventh claim, plaintiff argues that she is not liable for care and treatment charges incurred during her stay at Bellevue. Plaintiff contends, first, that she is under no obligation to pay the charges because they were incurred in violation of her constitutional rights. Even if her admission and treatment did not violate her constitutional rights, plaintiff argues, she is not liable for the charges because the admission and treatment were involuntary. Pl.'s Mem. at 18. Defendants do not contest plaintiff's claim that she is not liable for charges incurred for treatment administered in violation of her constitutional rights. Defs. Mem. at 23 n. 16. However, they contend that §§ 43.01 et seq. of the Mental Hygiene Law, and/or § 7385 of the New York Unconsolidated Laws make plaintiff liable for all fees incurred for care and treatment consistent with her constitutional rights, even if that care and treatment was administered involuntarily. I conclude that defendants are correct, and therefore that plaintiff is liable for fees incurred by her involuntary admission to Bellevue. Whether plaintiff is liable for the costs relating to the administration of Mellaril cannot be resolved until the constitutionality of that administration is determined at trial.

Whether a patient admitted to a psychiatric hospital pursuant to MHL § 9.39 is liable for fees for her care and treatment is a question of first impression in New York. MHL §§ 43.01 et seq. provides that patients able to pay[9] shall be liable for fees for services rendered, and authorizes the New York State Department of Mental Hygiene to charge and collect fees for mental health services provided by the state.[10] However, the statute is silent as to charging for services rendered to patients admitted involuntarily; moreover, MHL § 43.01 authorizes only the state, not the New York Health and Hospitals Corporation ("the HHC"), to whom plaintiff would be liable in this case, to collect fees. Section 7385(8) of the New York Unconsolidated Laws does authorize the HHC to "provide health and medical services for the public ... through and in the health facilities of the corporation ... and to establish and collect fees and other charges ... for the provision of such health and medical services." But it also makes no express mention of involuntary admissions. Plaintiff argues that, in the absence of express statutory language authorizing the HHC to collect fees from involuntarily admitted patients able to pay, plaintiff may not be held liable to the HHC for the costs of her involuntary admission. Defendants, in contrast, urge the court to follow the reasoning of the Supreme Court of Mississippi in *Chill v. Mississippi Hospital Reimbursement Comm'n*, 429 So.2d 574 (Miss.1983), in which a statutory scheme similar to New York's was interpreted to require the estate of an involuntarily-admitted patient to pay the costs of his care and treatment.

*Chill* involved the interpretation of the Mississippi Hospital Reimbursement Commission Act, which created the Mississippi Hospital Reimbursement Commission and authorized it to assess and collect charges for patient care. The Act provided that free hospitalization and treatment were to be made available to individuals unable to afford them, but explicitly stated that persons able to pay were not entitled to free services. However, the Act did not explicitly require

---

9. Plaintiff does not contend that she is unable to pay the fees for her care and treatment.

10. MHL § 43.01(a) provides: "The department shall charge fees for its services to patients and residents, provided, however, that no person shall be denied services because of inability or failure to pay a fee." MHL § 43.03(a) provides, in pertinent part: "The patient, his estate, his spouse, his parents or his legal guardian ... are jointly and severally liable for the fees for services rendered to the patient."

involuntarily hospitalized individuals to reimburse the state for the costs of their care. 429 So.2d at 577–78, 580. The *Chill* court concluded that, despite the lack of explicit language so providing, the Mississippi legislature intended to require reimbursement for patient care from all patients able to pay, even the involuntarily admitted. The court noted that the statute authorizing involuntary admission was in effect at the time the Mississippi Hospital Reimbursement Act was passed, and that if the legislature had intended to exclude involuntarily admitted patients from the Act's purview, it would have done so explicitly. 429 So.2d at 580–81. The court also pointed to significant public policy considerations weighing in favor of requiring reimbursement from involuntarily admitted patients who are able to pay for their own care:

> In-patient care of mentally ill persons is quite costly to the State of Mississippi. Not only must the patient be housed, clothed and fed, he must be provided care and treatment. Great expense is involved in rendering these services effectively. True, the involuntarily committed patient has in part been institutionalized for the protection and safety of society. But today there can be no doubt that a necessary predicate to involuntary civil commitment is a determination that the person is seriously mentally ill and in substantial need of professional care and treatment. In substantial part he is hospitalized for his own good. Seen in this context, the legislature may reasonably have enacted that the state may seek to recoup a small portion of the expense it has incurred. We find that it has done so.

429 So.2d at 581. Here, as in *Chill,* a statute provides that patients "shall be liable" for fees for services rendered.[11] MHL § 43.01. This statute and MHL § 9.39, which authorizes emergency admission, originally derive from a single statute[12] and are part of the

same general statutory scheme. When the New York legislature has wished to exempt certain patients from liability under this scheme, it has done so explicitly. *See* MHL § 43.03(c) (providing in pertinent part that certain patients "who receive services while being held pursuant to order of a criminal court ... shall not be liable to the department for such services"). No explicit exception exists for involuntarily admitted patients.

It is true that the general scheme of which § 43.01 *et seq.* is a part authorizes only the state, not the HHC, to collect fees. However, the HHC is authorized to collect fees under a separate statute, UL § 7385. The HHC was created by the New York legislature "for the benefit of the people of the state of New York and of the City of New York," in order to overcome inadequacies in services the legislature deemed "vital to the protection and the promotion of the health, welfare and safety" of the people of the both the city and the state of New York. UL § 7382. Having concluded that the New York legislature intended to require involuntarily admitted individuals who are able to pay the costs of their care and treatment to reimburse the state for those costs, it would be inconsistent to find that the legislature did not also intend to require such persons to reimburse the HHC. I agree with the reasoning in *Chill,* and hold that MHL § 43.01 *et seq.* and UL § 7385 must be construed to require a patient who is able to pay for the costs of her care and treatment to reimburse the state or the HHS for those costs, even if she was admitted involuntarily.

The court's interpretation of the statutory scheme is consistent with New York decisional law upholding the right of the state to collect fees for mental health services to wards or incompetents who could not consent to their retention or treatment. *See Matter of Tripp,* 275 A.D. 36, 87 N.Y.S.2d 137 (4th Dep't 1949) (state has claim against estate pursuant to Mental Hygiene Law for mainte-

---

**11.** Unlike the Mississippi statute, the New York scheme does not explicitly provide that no person shall be entitled to free services. *See supra* note 12. However, the precursor of MHL § 43.01 has been interpreted by the New York courts to have this effect. *See, e.g., In re Mangan's Will,* 83 N.Y.S.2d 393, 399 (1948) (holding that the purpose of New York's statutory scheme

is to provide for bringing of action, either against patient or a relative, where either is discovered to have property).

**12.** Both statutes derive from the New York Mental Hygiene Law of 1927.

nance of an incompetent); *Matter of Bloomfield,* 53 N.Y.2d 118, 440 N.Y.S.2d 609, 423 N.E.2d 32 (Ct.App.1981) (state's claim for recovery of fees from estate of incompetent who was treated at Bellevue has priority over city's; court assumes, without elaborating, that city also has a claim against estate). Plaintiff responds that these decisions are inapposite, because an involuntarily admitted patient is not necessarily incompetent to consent to her retention or treatment. The court agrees that the decision to admit a patient against her will does not necessarily imply a determination that she is incompetent for all purposes. However, involuntary admission does imply a judgment that she is not competent to make decisions about her own admission.[13] If this were not the case, it would never be appropriate to admit a patient against her will. Decisions cited by plaintiff are not to the contrary. Citing *Rivers v. Katz,* 67 N.Y.2d 485, 504 N.Y.S.2d 74, 79, 495 N.E.2d 337, 341–42 (1986), plaintiff notes that "[i]t is well-settled that an individual subject to involuntary hospitalization on an emergency basis remains competent to make treatment decisions." However, *Rivers* merely stands for the proposition that incompetence for one purpose—consent to admission—does not necessarily imply incompetence for another purpose—decisions about treatment. It does not hold that an involuntarily admitted patient must be deemed competent to make decisions of all sorts.[14]

I note that the conclusion that plaintiff is liable for the costs of care and treatment consistent with her constitutional rights does not entail a determination that she is liable for the costs associated with her treatment with Mellaril, because a jury may find at trial that the administration of Mellaril to plaintiff violated her constitutional rights.

## Conclusion

For the reasons stated above, plaintiff's motion for summary judgment as to the first cause of action is denied, and defendants' motion for summary judgment as to the first and second causes of action is granted. The Clerk of the Court is directed to dismiss plaintiff's first and second causes of action as to Drs. Sweeney and Lee. Defendants' motion for summary judgment as to plaintiff's fifth cause of action is hereby granted. The Clerk of the Court is directed to dismiss plaintiff's fifth cause of action as to Drs. Sweeney and Lee without prejudice to its renewal in a manner consistent with this opinion. Plaintiff's motion for summary judgment as to her third cause and seventh causes of action is hereby denied.

Any amendment to the pleadings must be filed by September 30, 1994. Any additional motions, other than motions in limine, must be filed by October 15, 1994. A joint pretrial order is due on November 1, 1994, and the case shall by ready for trial on November 2, 1994. Counsel are hereby directed to review the court's Individual Rules regarding trial readiness.

SO ORDERED.

**13.** Plaintiff argues that to conclude that she was incompetent to make a decision about her admission to Bellevue merely from the doctors' decision to admit her pursuant to MHL § 9.39 is to foreclose the possibility that the doctors were mistaken about her competence. She argues that the court must hold a hearing to determine whether she was in fact competent to decline admission, and if the court finds that she was competent, she must not be held liable for the costs of her care and treatment. Pl.'s Br. at 14. I disagree. MHL § 43.01 and UL § 7385 authorize the state and the HHS to collect fees for services from all patients who are admitted pursuant to the statutory scheme. The statutory scheme includes MHL § 9.39, the emergency admission statute. As noted above, I have concluded that plaintiff was admitted in conformity with MHL § 9.39. Therefore, provided she is able to pay, plaintiff is liable for the costs of her care and treatment.

**14.** For this reason, the court rejects plaintiffs' argument that requiring plaintiff to pay the costs of her care and treatment would be inconsistent with an equitable principle of restitution, which "deem[s] officious, and hence not compensable, services rendered to a competent individual who objected to such help." Pl.'s Reply Br. at 13. Because plaintiff cannot be regarded as competent to decline emergency admission, plaintiff's characterization of defendants' emergency services as "officious" is incorrect. I conclude that the principle of restitution is not inconsistent with the interpretation of New York's statutory scheme adopted here.