Brian DEMARCO, Plaintiff,

v.

S. SADIKER, M.D., personally, Edgar Paizin, M.D., personally, S. Singh Ohson, M.D., personally, John P. Iafrate, M.D., in his official capacity as Executive Director of Pilgrim Psychiatric Center, Defendants.

No. 93–CV–5938 (ARR).

United States District Court, E.D. New York.

May 22, 1995.

William M. Brooks, William P. Coyle, Mental Disability Law Clinic, Huntington, NY, for plaintiff.

Dennis C. Vacco, Attorney General, State of New York (Patricia Hingerton, Assistant Attorney General, of counsel), Hauppauge, NY, for defendants Paiz, Ohson and Iafrate.

Owen B. Walsh, Nassau County Attorney (William Riccio, Deputy County Attorney, of counsel), Mineola, NY, for defendant Sadiker.

### MEMORANDUM AND ORDER

ROSS, District Judge.

### *PRELIMINARY STATEMENT*

This case involves a civil rights action pursuant to 42 U.S.C. § 1983 and state law claims of false imprisonment stemming from plaintiff's involuntary confinement for twenty-one days as a patient at the Pilgrim Psychiatric Center. As the constitutional claims underlying the civil rights action, plaintiff alleges a violation of his Fourteenth Amendment right to substantive due process, claiming that he was involuntarily confined to a psychiatric hospital although he was not dangerous. Plaintiff further alleges a violation of his right to procedural due process, claiming that defendants failed to comply with the provisions of N.Y. Mental Hygiene Law § 9.37, which allows for involuntary confinement by a director of community services or his designee.[1] More specifically, plaintiff alleges that physician defendants Sadiker, Ohson and Paiz[2] authorized his involuntary hospitalization although he did not pose a danger to himself or others as a result of mental illness, First Amended Complaint, ¶ 29; and that defendants Sadiker and Paiz failed to make the necessary determination under § 9.37 that plaintiff posed a substantial risk of physical harm to himself or others by displaying suicidal, homicidal, or other violent tendencies. *Id.*, ¶ 32.[3]

Defendants move to dismiss the First Amended Complaint in its entirety pursuant to FED.R.CIV.P. 12(b)(6) or, in the alterna-

---

[1] The statute reads in relevant part:

§ 9.37 Involuntary admission on certificate of a director of community services or his designee

(a) The director of a hospital, upon application by a director of community services or an examining physician duly designated by him, may receive and care for in such a hospital as a patient any person who, in the opinion of the director of community services or his designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others; "likelihood of serious harm" shall mean:

1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or [sic] serious physical harm.

The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours, excluding Sunday and holidays, after such admission, if such patient is to be retained for care and treatment beyond such time and he does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital.

\* \* \* \* \* \*

N.Y. Mental Hygiene Law § 9.37 (McKinney 1983).

[2] Contrary to the official case caption, this is apparently the correct spelling of the defendant's name. Def.'s Mem. of Law, at 1.

[3] Defendant Iafrate, in no way personally involved with the confinement, and not mentioned in any of the four causes of action, is allegedly a proper defendant solely with respect to the requested injunctive relief of expungement of plaintiff's clinical records at Pilgrim Psychiatric Center. *See* Pl.'s Mem. of Law, at 7–10. Defendants also contest this assertion and move to dismiss the complaint as to Dr. Iafrate.

tive, for summary judgment pursuant to FED.R.CIV.P. 56, on three grounds: (1) failure to state a colorable constitutional claim; (2) qualified immunity; and (3) failure to state a claim for false imprisonment. The court heard oral argument from the parties on March 27, 1995, and received post-argument briefs by April 17, 1995. Based upon these arguments and a thorough review of the record, and for the reasons explained below, the motion for summary judgment[4] is granted with respect to defendants Sadiker, Ohson, and Iafrate, and denied at this time with respect to defendant Paiz, pending limited discovery.

## FACTUAL BACKGROUND

Plaintiff, a California resident, arrived in New York on December 20, 1992, to visit friends and relatives. Demarco Affid., ¶ 3; Def.'s Mem. of Law, at 4. In the first ten days of his stay, plaintiff voluntarily sought assistance at the emergency room of the Nassau County Medical Center (hereinafter "NCMC") on three occasions. Although the parties dispute the reasons for these visits, plaintiff acknowledges that on one occasion he complained that he had been intentionally fed an undercooked piece of chicken by his father's girlfriend. Demarco Affid., ¶¶ 7, 19; Def.'s Mem. of Law, at 5. On at least two of these visits, hospital staff members found that plaintiff verbalized paranoid ideations. Def.'s Mem. of Law, at 5; Hingerton Affid., Ex. B at 6, 11. On each of these occasions, apparently because they believed plaintiff suffered a mental illness, doctors administered a psychiatric evaluation. Id., ¶ 8; Pl.'s Mem. of Law, at 4; Def.'s Mem. of Law, at 5. After the third visit, plaintiff was prescribed Thorazine, a psychotropic medication. Def.'s Mem. of Law, at 5; Hingerton Affid., Ex. B at 7.

In the early morning hours of January 1, 1993, plaintiff called police to make a complaint against his step-brother and his step-brother's girlfriend for child abuse. Demarco Affid., ¶ 9. What transpired over the next few hours is disputed. It is undisputed, however, that plaintiff turned up at the Hicksville

Station of the Long Island Rail Road at 3:00 a.m. on January 1, where police observed him approaching other commuters and relating that his urine was clear. Demarco Affid., ¶ 10; Def.'s Mem. of Law, at 6. After a brief conversation with police, during which plaintiff informed them that he had been convicted in California for possession of a controlled substance, they took him to the NCMC. Demarco Affid., ¶ 11.

Upon arrival at the hospital, although the extent of plaintiff's cooperation and nature of his conduct is disputed, plaintiff admits, at least, that he was frustrated, angry, and in an uncooperative mood. Demarco Affid., ¶ 12. Further, it was necessary at some point for four security guards to subdue plaintiff and place him in four point restraints. Demarco Affid., ¶ 12; Def.'s Mem. of Law, at 6. A nurse found in plaintiff's possession, *inter alia*, two bottles of urine and several objects that appeared to be self-fashioned spikes or nails, but which plaintiff insists were spark plugs that he intended to sell for scrap value. Demarco Affid., ¶ 18; Def.'s Mem. of Law, at 7. The staff found it necessary to administer several sedative medications in the emergency room. Demarco Affid., ¶ 13; Def.'s Mem. of Law, at 6. Because of his earlier visits, doctors and nurses at the NCMC were familiar with plaintiff, his complaints, his history of drug use and previous hospitalization in a psychiatric institution. Demarco Affid., ¶ 10, 12, 22; Def.'s Mem. of Law, at 7; Hingerton Affid., Ex. B, at 17.

Plaintiff states that he only vaguely remembers being examined by Dr. Sadiker before being transferred to the Pilgrim Psychiatric Center (hereinafter "PPC"). Demarco Affid., ¶ 14. Apparently for this reason he has not disputed, and cannot dispute, that she performed a thorough examination of plaintiff, in the course of which she found that plaintiff was "extremely paranoid", "angry", and "hostile", with "questionable impulse control" and "insight and judgment impaired." Hingerton Affid., Ex. B, at 8. Dr. Sadiker concluded that plaintiff was uncontrollable, unpredictable, and potentially

4. Matters outside the pleading have been presented to and considered by the court, and there-

fore the motion is treated as a motion for summary judgment. FED.R.CIV.P. 12(b).

dangerous to himself and others. Hingerton Affid., Ex. B, at 11–12. Plaintiff also does not dispute that Dr. Sadiker filled out forms entitled "Application for Involuntary Admission" under M.H.L. § 9.37 and "Certificate of Examination," the latter of which refers to the former for an explanation of the reasons for admission. Hingerton Affid., Ex. B, at 1–3. Defendants do not dispute that neither the "harmful to self" nor the "harmful to others" box has been checked on that Certificate. *Id.*

Upon arrival at PPC, plaintiff had some contact with Dr. Paiz; the extent of this contact is a critical disputed fact. Plaintiff insists that Dr. Paiz did nothing more than hand him a form to sign. Demarco Affid., ¶ 17, 18. Defendants assert that Dr. Paiz performed a full examination, and have produced, in support of this claim, a document entitled "Screening/Admission Note," dated January 1, 1993 at 1:00 p.m., which details Dr. Paiz's impressions of plaintiff and gives no indication of being manufactured. Hingerton Affid., Ex. B, at 14–15. Plaintiff does not dispute that, according to this document, Dr. Paiz concluded and recorded that he was "hostile," "delusional," and had "impaired insight and judgment." Hingerton Affid., Ex. B, at 14–15. The document does not explicitly state that plaintiff is a threat to himself or others, and defendants have not claimed otherwise. *Id.*

As required by M.H.L. § 9.37, Dr. Ohson performed an examination of plaintiff seventy-two hours later, on January 4, 1993. Demarco Affid., ¶ 19; Def.'s Mem. of Law, at 8. Plaintiff admits that he appeared agitated during this interview, that he "mentioned" that Dr. Ohson was collaborating with police to entrap him, that he told Dr. Ohson that he had been intentionally served undercooked chicken, that he threatened to sue Dr. Ohson for wrongful confinement, and that he walked out of the interview. Demarco Affid., ¶ 20. Plaintiff also does not dispute that he told Ohson that, "I used to be a very dangerous man," but rather offers the affidavit of another psychiatrist to explain the statement. Stastny Affid., ¶ 28. Plaintiff does not dispute that Ohson concluded and recorded that he was "threatening" and "potentially assaul-

tive," Hingerton Affid., Ex. B, at 26, and that Ohson checked a box on the 72–hour Certificate which stated that plaintiff showed a tendency to harm others. *Id.*, at 5. Finally, plaintiff does not dispute the validity of the pages and pages of progress notes in which various nurses and doctors found him threatening, menacing, agitated, verbally abusive, uncooperative and paranoid. Hingerton Affid., Ex. B, at 25–32. Plaintiff was released into the custody of his aunt on January 22, 1993, the same day on which a court hearing regarding his confinement was scheduled. Demarco Affid., ¶ 21; Def.'s Mem. of Law, Ex. B, at 31–32.

## DISCUSSION

### I. Summary Judgment Standard

■ Summary judgment is appropriate when there exists no genuine issue of material fact in a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A disputed material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. The moving party bears the burden of demonstrating that no material fact is in dispute. *Hurwitz v. Sher*, 982 F.2d 778, 780 (2d Cir.1992) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *cert. denied*, —— U.S. ——, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993). In examining the record, the court must resolve all ambiguities against the movant and draw all favorable inferences in favor of the nonmovant. *Adickes*, 398 U.S. at 158–59, 90 S.Ct. at 1609; *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). Once the moving party has made the necessary showing, however, mere allegations or denials by the non-moving party are insufficient to show that there exists a triable issue of fact. *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). The non-moving party must instead "produce 'significant probative evidence tending to support [its position].'" *Id.* (quoting *United States v. Pent-R-Books, Inc.*, 538 F.2d 519, 529 (2d Cir. 1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977)). The issue of qualified immunity, in particular, is one that should be decided upon a motion for sum-

mary judgment, and before discovery, whenever possible. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

## II. *Establishing a Constitutional Due Process Claim*

### A. *The Distinction Between Substantive and Procedural Due Process*

■ Involuntary civil commitment to a mental institution is a "massive curtailment of liberty" which requires due process protection. *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir.1983) (quoting *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980)). The Supreme Court has held, therefore, that a state may not constitutionally "confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). The Court concluded that confinement of a nondangerous person violated the Fourteenth Amendment due process right to liberty, even if a state statute authorized the confinement of harmless individuals, or if the confinement was originally founded upon a constitutionally adequate basis which later disappeared. *Id.* at 574–75, 95 S.Ct. at 2493.

One of the difficult issues raised by this case is the nature of the distinction between substantive and procedural due process in the context of an involuntary commitment to a psychiatric hospital. Plaintiff has argued that a critical difference exists between the procedural element of finding an individual dangerous in accordance with the mental health statute, and the substantive element of actually being dangerous as a factual matter. Defendant, on the other hand, has maintained that the two claims cannot be disentangled as a matter of law in the manner suggested by plaintiff. Defendant contends that because the entire mental hygiene statute has been upheld on both substantive and procedural due process grounds, the single fact of acting in accordance with the statute satisfies both elements. State Def.'s Supplemental Reply Mem., at 5 (citing *Project Release*, 722 F.2d at 971).

The Court in *O'Connor* did not specify whether the hospitalized individual's substantive or procedural right to liberty under the Due Process Clause, or both, was violated, nor did it even state whether the two were distinct in that case. The Court's reasoning reveals that the distinction exists, however, because it stated that even if state procedures are followed, the right to freedom can be violated. The right can also be violated if the original, constitutional basis for the confinement ceases to exist. Thus, a substantive element must be both incorporated into the statute by which one is committed, *and* that substantive element must continue to be met, in order to confine someone to a psychiatric hospital. That the substantive element can be addressed wholly apart from the procedural element is implicit in the Second Circuit's decision in *Glass v. Mayas*, 984 F.2d 55, 57 and n. 4 (2d Cir.1993), in which the court acknowledged in a factually similar case that the plaintiff did not allege a procedural violation, and developed a qualified immunity standard based solely upon the substantive question whether the plaintiff was dangerous.

Despite these principles, two courts appear to have held that if a defendant followed the statute and made the requisite finding of dangerousness, that alone satisfies the requirements of substantive due process. *Rodriguez v. City of New York*, 861 F.Supp. 1173, 1184 (S.D.N.Y.1994); *dePoel v. City of New York*, 772 F.Supp. 106, 108 (E.D.N.Y. 1991). Such a conclusion, however, fails to accommodate satisfactorily the Supreme Court's substantive pronouncement in *O'Connor* that the involuntary commitment of a nondangerous individual violates the constitutional right to freedom, even if such a confinement is authorized by statute. Further, the conclusion that substantive due process is satisfied every time the statute is applied and a finding of dangerousness is made is not mandated by the Second Circuit's decision in *Project Release*, which held no more than that the statute meets the *facial* requirements of substantive due process. In other words, the statute requires

that physicians determine whether or not the patient is "a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members of friends." *O'Connor,* 422 U.S. at 576, 95 S.Ct. at 2494; *Project Release,* 722 F.2d at 971. That the statute is facially valid, however, does not mean that, *as applied* to an individual case, it satisfies the substantive constitutional requirements of *O'Connor,* where, as a matter of determinable fact, the individual was not dangerous.

■ From this analysis, it follows that, with respect to involuntary psychiatric commitments, substantive and procedural due process can be distinctly analyzed as a matter of law in the manner plaintiff suggests. Thus, to have been afforded procedural due process means to have been given the benefit of procedural safeguards to reduce the chance of an erroneous commitment. To have been afforded substantive due process means not to have been committed if one was not dangerous.

B. *Mens Rea in the Context of a Section 1983 Action*

■ "The Supreme Court has held that the protections of the Due Process Clause, whether procedural or substantive, are simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Lunde v. Oldi,* 808 F.2d 219, 220–21 (2d Cir.1986) (citing *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Drawing upon this principle, defendants contend that plaintiff has failed to plead a cognizable constitutional violation because, at most, the complaint charges them with malpractice and negligence. The threshold issue to be addressed is, therefore, whether plaintiff must plead more than an act of negligence.

Plaintiff argues that the intentional act of confinement sufficiently states a cause of action under § 1983, because it was defendants' decision to act on their belief that plaintiff was dangerous, rather than the belief itself, that deprived him of his liberty. Pl.'s Post-Argument Supplemental Mem. of Law, at 2–3; Transcript of Oral Argument, March 27, 1995 (hereinafter "Tr."), at 17. Defendants argue to the contrary that plaintiff has, at most, alleged a claim of negligent confinement of a nondangerous person. State Def.'s Supplemental Mem. of Law, at 7; Reply Mem. in Support of State Def.'s Motion, at 4. Because every involuntary confinement under the mental hygiene statute is a deliberate act, defendant argues, plaintiff's theory would allow every involuntary commitment to be challenged in federal court. State Def.'s Supplemental Reply Mem., at 2.

Defendants' argument misconstrues the analytical framework for examining § 1983 actions brought to remedy injuries resulting from involuntary psychiatric commitments. As the Third Circuit has recognized, "[c]ases such as *Davidson,* dealing with a state of mind requirement for § 1983/due process actions, relate only to the highly unusual circumstance where the *deprivation* of life, liberty or property the case was predicated upon was not intentional, as opposed to where the failure to provide adequate process was not intentional." *Sourbeer v. Robinson,* 791 F.2d 1094, 1104 (3d Cir.1986) (Higginbotham, J.), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987). In *Sourbeer,* the court held that the intentional act of keeping plaintiff in administrative custody provided sufficient state of mind to state a § 1983 action, regardless whether the failure to provide due process was without fault. *Id.* at 1105; *see also Franklin v. Aycock,* 795 F.2d 1253, 1262 (6th Cir.1986) (concluding that a prison board's decision to place plaintiff in disciplinary segregation was "deliberate, intentional conduct" sufficient to state a § 1983 claim, regardless whether the failure to provide adequate process was only negligent); *Soto v. Lord,* 693 F.Supp. 8, 15 n. 15 (S.D.N.Y.1988) (following *Daniels* and citing *Franklin* with approval, court states that "liability, if it exists, is predicated on the defendant's intentional decision to mete out punishment against the plaintiff").

Defendants attempt to distinguish *Sourbeer* on the ground that "it was the deliberate action coupled with the defendants' failure to provide meaningful reviews" that lead the

court to conclude that the plaintiff stated a constitutional claim. State Def.'s Supplemental Reply Mem., at 3. This proposed distinction, however, is inconsistent with Judge Higginbotham's clear statement that "it was unnecessary for the district court to determine whether [the failure to provide constitutionally required process] was intentional, grossly negligent, or without fault at all, because there would be a constitutional violation in any event" as the result of the deliberate deprivation of liberty. *Sourbeer,* 791 F.2d at 1105. The alleged deprivation of plaintiff's liberty in the case at bar was the result of a similarly intentional act of confinement, as opposed to the negligence of leaving a pillow at the top of a stairwell in *Daniels,* or failing to protect one prisoner from another in *Davidson,* or losing a hobby kit in another well-known case on this topic, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

Applying *Sourbeer* and the Supreme Court's § 1983 jurisprudence to involuntary commitments, it is evident that, to state a cause of action, a plaintiff must allege an intentional commitment that violated due process, as opposed to alleging a commitment that intentionally violated due process. Whether this confinement decision was then protected by qualified immunity is a separate matter, and it is the breadth of that principle that protects officials who make commitment decisions from litigating each and every decision. *See, e.g., Plain v. Flicker,* 645 F.Supp. 898, 908 (D.N.J.1986) (observing that "[p]hysicians need not feel threatened that every signature on a certificate of commitment will lead to a civil rights lawsuit" because of their entitlement to qualified immunity).

The cases cited by defendants do not contradict this conclusion. For example, defendants rely heavily on *Savacool v. Delaware County Dep't of Mental Health & Mental Retardation,* Civ. Action No. 92–2142, 1992 WL 391393, at *2 1992 U.S. Dist. LEXIS 19326, at *3–4 (E.D.Pa. December 16, 1992), in which the court stated that "[n]egligence on the part of officials of a state or municipality, acting in their official capacity, is not enough to overcome their qualified immunity under 42 U.S.C. § 1983. There must be

something akin to deliberate indifference or intention to harm." The court dismissed on qualified immunity grounds the plaintiff's claims that defendants "negligently failed to investigate the allegations that resulted in her involuntary confinement and in the maintenance of a record concerning her mental illness." *Id.* at *2, 1992 U.S.Dist. LEXIS 19326, at *3, 5. Thus, *Savacool* does not support defendant's claim that plaintiff has failed to establish a constitutional violation, but only the proposition that qualified immunity protects officials from merely negligent violations.

Nor is defendants' contention supported by *Butler v. Commissioner of Mental Health,* 463 F.Supp. 806, 808 (E.D.Tenn.1978). In *Butler,* the court concluded that the defendants had not directly participated in the plaintiff's unconstitutional confinement, and were therefore being charged with nothing more than negligence in allowing it to occur. In the present case, of course, defendants Sadiker, Paiz and Ohson were directly responsible for the confinement. Significantly, the court in *Butler* further noted that a state official who intentionally confines a person who is a danger neither to himself nor others would be liable for damages, unless entitled to the shield of qualified immunity. *Id.* at 809.

Defendants also maintain that the Supreme Court's decision in *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), *reh'g denied,* 501 U.S. 1265, 111 S.Ct. 2920, 115 L.Ed.2d 1084 (1991), lends support to the argument that where a plaintiff's claim sounds in negligence, thereby failing to establish the "requisite *mens rea*" for a § 1983 action, it should be dismissed. *See* State Def.'s Supplemental Mem. of Law, at 7. However, as defendants themselves state, in *Siegert,* "the Supreme Court clarified the 'analytic structure under which a claim of qualified immunity should be addressed.'" *Id.* (quoting *Siegert,* 500 U.S. at 231, 111 S.Ct. at 1793). Thus, the Court emphasized that the first step in analyzing the *entitlement to qualified immunity* is to determine whether the plaintiff has "asserted a violation of a constitutional right at all." *Siegert,* 500 U.S. at 233, 111 S.Ct. at 1794. In relying on

*Siegert,* defendants' argument blurs the distinction between the principle of qualified immunity and the elements required to state a viable due process claim in the first instance. What the Supreme Court actually held in *Siegert* was that the plaintiff had failed to establish a violation of the constitution because one's reputation is not a constitutionally protected interest. *Id.* at 235, 111 S.Ct. at 1795. Freedom from involuntary confinement when one is not dangerous, to the contrary, is a very clearly established and protected liberty interest. *See O'Connor,* 422 U.S. at 576, 95 S.Ct. at 2494; *Glass,* 984 F.2d at 57. Thus, the *Siegert* decision provides no support for defendants' argument.

Moreover, defendants cite *Plain,* 645 F.Supp. at 909, for the proposition that the deliberate conduct of an involuntary confinement does not itself sufficiently state a § 1983 claim. State Def.'s Supplemental Reply Mem., at 4. What that court in fact held[5] was that relatively minor deviations from the New Jersey involuntary confinement statute—only one physician signed the commitment papers rather than the statutorily required two—did not establish a constitutional due process violation.[6] The court proceeded to clarify in a footnote that the Supreme Court's *Davidson* opinion had no influence on the result because the plaintiff alleged an intentional rather than negligent deprivation of liberty. *Id.,* n. 6. In other words, the court did not simply dismiss the case pursuant to *Davidson* for failure to allege more than mere negligence because the plaintiff had alleged that he was *intentionally* committed to a psychiatric clinic, and because it was unclear whether *Davidson* would apply to officials beyond the prison system. *See id.*

Two decisions by district courts within this circuit in factually similar circumstances provide defendants with their best argument that plaintiff must allege that the violation of

due process itself was intentional. In *dePoel v. City of New York,* for example, in dismissing the substantive due process claim of a plaintiff confined to a hospital pursuant to M.H.L. § 9.27, the court relied upon the fact there was "no suggestion that the doctors maliciously or in bad faith declined to follow the statutory procedure." 772 F.Supp. 106, 108 (E.D.N.Y.1991). The court's language suggests that because the defendants made the statutorily required finding of dangerousness, there was no substantive basis upon which to reexamine that finding, absent a showing that the defendants acted out of malice or in bad faith. *Id.* The court then denied summary judgment on the procedural due process claim because an issue of fact existed as to why plaintiff's statutorily mandated judicial hearing had been repeatedly adjourned. *Id.* at 109.

More recently, in *Rodriguez v. City of New York,* the district court held that because the defendants made the required assessment of dangerousness, they were entitled to summary judgment on both the substantive and procedural due process claims. 861 F.Supp. 1173, 1184 (S.D.N.Y.1994). The court summed up the analysis as follows:

> Plaintiff disagrees with defendants' conclusion that she posed a likelihood of substantial harm to herself. However, the statute does not require that a physician's assessment of the likelihood of serious harm be correct; it requires only that the assessment be made on the basis of criteria that are specified in the statute.

*Id.*

■ To the extent that these passages from the *dePoel* and *Rodriguez* opinions may be read to suggest that a plaintiff who has been involuntarily committed to a mental health institution must allege an intentional failure to apply, or an intentional misapplication of, the mental hygiene statute in order to establish the requisite *mens rea* for a

---

5. The bulk of the decision is devoted to a statute of limitations issue and a determination whether private physicians who certify involuntary commitment are state actors.

6. The Seventh Circuit has similarly held that the failure to apply rigorously the provisions of a facially valid statute does not constitute a consti-

tutional injury. *Villanova v. Abrams,* 972 F.2d 792, 798 (7th Cir.1992). That holding is not inconsistent with the conclusion that a plaintiff need not allege an intentional failure to follow or misapplication of the statute in order to sustain a claim in the first instance.

§ 1983 action, this court disagrees with those decisions. The notion that merely applying the statute and concluding that an individual is dangerous is sufficient to satisfy the burdens of both procedural and substantive due process does not square with the Supreme Court's holding in *O'Connor*. Surely the mental hygiene statute is intended to ensure that physicians make not just an assessment, but the correct assessment. To hold otherwise would be to preclude at the pleading stage every case in which the formalities of the statute are followed regardless of the plaintiff's true mental status, and every case in which the statute is accidently but in good faith misapplied or omitted. If this were the case, the delicate balance between individual liberty and society's interests in protecting its members from dangerous fellow citizens would be shifted intolerably askew.

From this analysis, it follows that where, as here, a plaintiff alleges that he was intentionally committed to a mental hospital without the requisite finding of dangerousness and/or without his actually being dangerous, he has sufficiently plead the *mens rea* requirement of a § 1983 cause of action based upon a due process violation, even if the alleged due process violation could be construed as having occurred as the result of mere negligence.

### C. *Establishing a Due Process Claim in this Case*

■ Defendants move for summary judgment on the ground that plaintiff has failed to state a colorable constitutional claim. Turning to the factual support for plaintiff's due process claims in this case, his only allegation in support of a procedural due process violation is that defendants Sadiker and Paiz failed to make the requisite finding of dangerousness. *See* First Amended Complaint, ¶ 31; Pl.'s Mem. of Law in Opp'n, at 12–16. Plaintiff does not allege that these defendants omitted any other procedural requirement.[7] The undisputed evidence, however, indicates that Dr. Sadiker applied the statute and made the requisite finding of dangerousness. Dr. Sadiker performed an examination of plaintiff upon his arrival at the NCMC, the occurrence of which plaintiff does not dispute, although he does not remember it. She concluded and recorded that plaintiff was uncontrollable, unpredictable, and potentially dangerous to himself and others. Hingerton Affid., Ex. B, at 6–9, 11–12. Dr. Sadiker filled out forms entitled "Application for Involuntary Admission" under M.H.L. § 9.37 and "Certificate of Examination," the latter of which refers to the former for an explanation of the reasons for admission. Hingerton Affid., Ex. B, at 1–3. Although he does not agree with Dr. Sadiker's conclusion, plaintiff cannot overcome the fact, well-established by the documentary evidence, that she made the required determination. Thus, the undisputed evidence fails to establish as a matter of law a procedural due process violation by Dr. Sadiker.

■ The basis of plaintiff's procedural due process claim against Dr. Paiz is that he never performed the required psychiatric examination before admitting plaintiff to PPC; thus, he did not make the required finding of dangerousness. The statute states: "The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission." M.H.L. § 9.37(a)(2). Although this provision does not specifically indicate that the confirmation of the initial opinion of the director of community services must be based upon a personal examination of the patient, that requirement seems to be mandated by the general spirit of the statute.[8] Defendants conceded as much at oral

---

7. Plaintiff hints at bad faith by defendants in releasing him from PPC on the very day of a scheduled court hearing regarding his confinement. Pl.'s Mem. of Law in Opp'n, at 19. However, this does not reveal a procedural violation, as that hearing was scheduled well within the sixty day statutory time frame for confinement without judicial review, *see* M.H.L. § 9.31(a), and plaintiff has not alleged that it was not scheduled within five days of the request. *See* M.H.L. § 9.31(c).

8. This court does not interpret as contrary to this notion the principle that, under New York law, defendants are entitled to rely upon information reported by others in making their assessment of dangerousness. *See Rodriguez*, 861 F.Supp. at 1184 n. 7 (citing *Rubenstein v. Benedictine Hosp.*, 790 F.Supp. 396, 411 (N.D.N.Y.1992)). Reliance upon outside information is not tantamount to complete abdication of a duty to perform a personal examination.

argument, by admitting with respect to the qualified immunity analysis that it would have been objectively unreasonable for Dr. Paiz not to have personally examined plaintiff before admitting him to PPC. Tr. at 9–10. Plaintiff insists that Dr. Paiz did nothing more than hand him a form to sign. Demarco Affid., ¶¶ 17, 18.

Whether Dr. Paiz performed an examination of plaintiff in which he made the required finding of dangerousness is a critical, material fact, because if Dr. Paiz confirmed the need for hospitalization without performing the required examination of plaintiff, that failure to follow the statute would constitute a due process violation. *See, e.g., dePoel,* 772 F.Supp. at 109 (denying summary judgment on procedural due process claim where plaintiff's statutorily required judicial hearing was repeatedly adjourned without explanation). Whether Dr. Paiz performed this examination is also a disputed fact. The question at this point, then, is whether it is "genuinely" disputed in a manner sufficient to survive the present motion.

■ Plaintiff has submitted an affidavit in which he states that "Dr. Paiz never examined me, or even questioned me." Demarco Affid., ¶ 18. Defendants point to several pieces of documentary evidence which, taken together, create a strong impression that, contrary to plaintiff's sworn statement, Dr. Paiz did in fact examine plaintiff. First, they have produced the "Screening/Admission Note," dated January 1, 1993 at 1:00 p.m., which details Dr. Paiz's psychiatric impressions of plaintiff. Hingerton Affid., Ex. B, at 14–15. Second, they have produced a document written by a Nurse Buehler, in which she records that Dr. Paiz performed a physical examination and indicates that a conversation between plaintiff and Dr. Paiz occurred in which plaintiff imparted information about his stay in a facility in California. Hingerton Affid., Ex. B, at 17. Third, defendants have produced as part of their post-argument brief documents relating to the physical examination of plaintiff by Dr. Paiz. State Def.'s Supplemental Mem. of Law, App. A. While each of these documents weakens the credibility of plaintiff's claim that Dr. Paiz performed no examination

whatsoever, none actually establishes with any degree of certainty that Dr. Paiz performed a legally sufficient psychiatric or psychological examination. The question, then, is whether plaintiff's sworn denial is sufficient, without more, to withstand the present motion. Although defendants argue vigorously that it is not, the court concludes that it is, at least in the absence of further discovery on the issue.

While it may be true that the court can disregard plaintiff's affidavit if it is simply "too incredible to be accepted by reasonable minds," *Butler v. Bensinger,* 377 F.Supp. 870, 874 (N.D.Ill.1974), it is not too incredible to believe that in the hectic atmosphere of a busy mental health institution a doctor might "rubber-stamp," as plaintiff describes it, the admission of a patient based upon the observations of others. *See* Pl.'s Supplemental Reply Mem. of Law, at 3. Thus, absent further discovery, the court cannot conclude that plaintiff's claim is inherently "incredible." Further, this is not a case in which plaintiff's affidavit contradicts previous deposition testimony such that the affidavit cannot be taken to create a genuine issue of material fact. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (affirming summary judgment where plaintiff's assertion in affidavit that he was coerced into waiving certain rights contradicted prior deposition testimony that he had cooperated willingly); *Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) (concluding that plaintiff's affidavit in opposition to summary judgment motion was inconsistent with four days of deposition testimony). Plaintiff's claim that Dr. Paiz did not perform an examination is not inconsistent with any prior testimony on his part, and is not inconsistent with his Amended Complaint just because the claim is not specifically set forth in that pleading.

Although the party opposing a motion for summary judgment is required to respond with significant probative evidence rather than mere allegations or denials, *see generally Project Release,* 722 F.2d at 968–69, plaintiff cannot provide such evidence without at least some limited discovery on the examination issue. It would be inequitable to allow

defendants to offer all of their evidence that Dr. Paiz performed the examination without providing plaintiff an opportunity to adduce evidence that he did not. Moreover, although plaintiff offers at this point nothing more than a denial that Dr. Paiz examined him, the deposition of Dr. Paiz could conceivably uncover material issues of disputed fact. *See Messina v. Mazzeo,* 854 F.Supp. 116, 141 (E.D.N.Y.1994). In *Messina,* the defendants opposed the plaintiff's Rule 56(f) request for a continuance on the ground that they had already produced the plaintiff's medical records. *Id.* Judge Glasser held that, despite production of these records, it could not "be said with certainty that a deposition of [defendant physician accused of improper medical care] will not uncover material issues of disputed fact ..." *Id.* The same can be said of the present situation. For all of these reasons, plaintiff has sufficiently raised a genuine issue of material fact on his procedural due process claim against Dr. Paiz to survive defendants' motion for summary judgment for failure to state a constitutional claim.

■■ A genuine issue of material fact also exists regarding plaintiff's substantive due process claim against Drs. Sadiker, Paiz and Ohson. The court concludes that where, as here, a plaintiff sufficiently pleads that he was involuntarily committed although he did not pose the threat of harm to himself or others, hospital officials responsible for the commitment are not entitled to judgment as a matter of law on a substantive due process claim on the basis of proof that they applied the statute and found the plaintiff dangerous. Rather, defendants must show that no reasonable jury could return a verdict for plaintiff, i.e., no reasonable jury could conclude based upon the undisputed facts that this plaintiff did not pose a threat of harm to himself or others. Viewed in this way, and because of the fact-specific nature of this question, virtually every substantive due process claim in this area would survive summary judgment, except in the most extreme cases. Plaintiff's behavior in the present case did not rise to that level. Therefore, this case, like most cases, would require expert affidavits, reports and/or testimony from psychiatrists and psychologists for both sides

of the dispute, and an ultimate determination by a jury, were it not for the doctrine of qualified immunity.

### III. *Qualified Immunity on the Substantive Due Process Claim*

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly wrongful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). The official is entitled to judgment as a matter of law by satisfying this standard, which, restated, entails a two step analysis: (1) whether the right allegedly violated was "clearly established" at the time, and if it was, (2) whether it was "objectively reasonable" for the official to believe that his or her actions did not violate that right. *Ayeni v. Mottola,* 35 F.3d 680, 684 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995). To determine whether the right was clearly established at the time the official acted, the Second Circuit has stated that the court should consider: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)). Thus, "[a]ssertion of the privilege should be upheld unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039).

On the second, "objective reasonableness" prong, summary judgment is appropriate when, "'even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of

the acts complained of ... it was objectively reasonable for [the official] to believe that his acts did not violate those rights." *Ying Jing Gan,* 996 F.2d at 532 (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). The Second Circuit has further refined this principle into a specific standard to apply in assessing qualified immunity in the context of substantive due process claims [9] arising from involuntary commitment under New York's Mental Hygiene Law:

> The Supreme Court has held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members." *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). Accordingly, New York law has been interpreted to require a finding of dangerousness. *See Matter of Scopes v. Shah,* 59 A.D.2d 203, 398 N.Y.S.2d 911, 913 (3d Dep't 1977); *Project Release v. Prevost,* 722 F.2d 960, 973 (2d Cir.1983). Thus, the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined [plaintiff] and in light of the information that they possessed, that [plaintiff] was dangerous."

*Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir. 1993).[10]

The question to be resolved, then, is whether it was objectively reasonable to conclude, based on plaintiff's history and behavior on the days in question, that he was dangerous, i.e., posed a likelihood of serious harm to himself or others. M.H.L. § 9.37. Plaintiff argues that he has raised a genuine issue of disputed fact by submitting the unrebutted expert affidavit of Dr. Peter Stastny, a psychiatrist who conducted a personal interview with plaintiff and reviewed plaintiff's affidavit and the clinical records from the NCMC and PPC relating to his involuntary confinement. Stastny Affid., ¶¶ 1, 2, 7. Dr. Stastny asserts that there is "little correlation" between mental illness and dangerousness, lists what he believes to be the necessary assessments and factors to be considered by a psychiatrist making an evaluation of dangerousness, and offers alternative interpretations of some of the behavior that defendants relied upon in concluding that plaintiff was dangerous. Stastny Affid., ¶¶ 9, 12–13, 14, 28. Drawing upon the facts of the case, Dr. Stastny provides his expert opinion that it was not objectively reasonable for Dr. Paiz, and may not have been objectively reasonable for Drs. Sadiker and Ohson, to have concluded that plaintiff was dangerous. Stastny Affid., ¶¶ 11, 21, 25; Pl.'s Supplemental Reply Mem. of Law, at 10–11; Pl.'s Post–Argument Supplemental Mem. of Law, at 19. With respect to Drs. Sadiker and Ohson, at least, this argument must be rejected.

## A. Drs. Sadiker and Ohson

■ If the protection of qualified immunity for physicians and psychiatrists making commitment decisions pursuant to the Mental Hygiene Law is to have any meaning, it is evident that those decisions cannot be reex-

---

**9.** The court noted that the plaintiff did not claim that the defendants violated the legal procedures required for his commitment, i.e., M.H.L. § 9.39; in other words, he did not state a procedural due process claim. *See Glass v. Mayas,* 984 F.2d 55, 57 n. 4 (2d Cir.1993).

**10.** The *Glass* qualified immunity standard has been rephrased as "whether defendants reasonably believed that their decision to admit plaintiff complied with the [mental hygiene] statute." *Rodriguez v. New York,* 861 F.Supp. 1173, 1185 (S.D.N.Y.1994) (citing *Glass,* 984 F.2d at 57). Although the court in *Rodriguez* appears to have granted qualified immunity on both the procedural and substantive due process claims under this standard, this particular restatement of the *Glass* standard seems best suited to the proce-

dural due process analysis. The *Glass* standard focusses more precisely for purposes of a substantive due process analysis on whether it was reasonable to believe that plaintiff was dangerous. Based upon the *Rodriguez* gloss on the *Glass* standard, defendants develop the argument, rejected above, that if they "acted in accordance with the statute, the demands of both substantive and procedural due process would be satisfied." Def.'s Supplemental Reply Mem. of Law, at 5. It is clear from the *Glass* standard, however, that even if defendants complied with the statute, i.e., examined plaintiff, found him dangerous, and committed him on that basis, they could still be found to have acted in an objectively unreasonable manner with respect to plaintiff's right to substantive due process.

amined after-the-fact solely on the basis of the testimony of other psychiatrists who would have reached a different conclusion. Plaintiff does not appear to dispute that proposition. Rather, plaintiff's argument appears to be that without further discovery, it is not possible for the court to decide whether defendants' actions were objectively reasonable. The expert affidavit proffered by plaintiff is thus intended to identify gaps in the factual record assertedly giving rise to an inference that defendants' actions may not have been objectively reasonable. Even for this purpose, however, the expert affidavit submitted in this case does not raise a genuine issue of material fact. The court finds that viewing all of the evidence, including the expert's affidavit, in the light most favorable to plaintiff, and drawing all reasonable inferences in his favor, no reasonable jury could conclude that it was objectively unreasonable for defendants Sadiker and Ohson to have believed that their conduct did not violate plaintiff's rights. *Wachtler v. County of Herkimer,* 35 F.3d 77, 80 (2d Cir.1994).

Qualified immunity, and the proposition that it's application should be resolved at the summary judgment stage and before discovery whenever possible, would be eviscerated if discovery were necessary whenever a plaintiff's expert swears that it may not have been objectively reasonable for a doctor examining the patient at the scene to come to a particular conclusion when other interpretations were possible, without making certain determinations and performing certain psychological tests.[11] The Supreme Court has stated that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *see Messina v. Mazzeo,* 854 F.Supp. 116, 143 (E.D.N.Y. 1994). The Court specifically noted in addressing a false arrest claim that "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a war-

rant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* It is therefore apparent that in that broad, gray area of dispute in which reasonable psychologists and psychiatrists debate when someone may be considered dangerous, what type or amount of evidence is sufficient to make that determination, what tests or evaluations should be performed, and how certain behavior should or could be interpreted, qualified immunity still attaches because it is not *obvious* that no reasonable, competent doctor in that situation at that moment would have made the same decision defendants made.

The cases plaintiff relies heavily upon, *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990) and *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.), *reh'g denied,* 880 F.2d 421 (11th Cir.1989), do not alter this conclusion. A review of the *Waldrop* case indicates that the disputed issue of fact was whether the defendant possessed the requisite state of mind—deliberate indifference as opposed to negligence—to have violated a clearly established constitutional right in the first place. The *Liscio* case did not involve a qualified immunity analysis at all, and was instead solely an examination whether genuinely disputed issues existed regarding the requisite state of mind to maintain a § 1983 action. Although expert affidavits raised a sufficient issue of fact in both cases, neither case establishes a *per se* rule that where the propriety of a physician's response to a presenting set of medical or psychiatric circumstances is disputed by an expert affidavit, summary judgment is inappropriate.

Contrary to plaintiff's apparent assumption, a critical difference exists between the analysis in *Waldrop* and *Liscio,* and the analysis appropriate to the case at bar. The courts in those cases were called upon to determine whether, under the specific presenting circumstances, a physician was deliberately indifferent to the serious medical needs of the plaintiff such that a clearly established right was violated. In this case,

---

**11.** The court acknowledges that in the course of granting summary judgment in favor of a physician-defendant in a similar case, one court observed in *dicta* that the plaintiff had not submitted "an affidavit of another physician or psychia-

trist stating that, faced with the same presenting symptoms, it would be unreasonable, and therefore not privileged, for the treating physician to fill out an application for an involuntary commitment." *Rubenstein,* 790 F.Supp. at 410.

the court must decide whether, even assuming that a clearly established right was violated, it was objectively reasonable to believe that plaintiff posed a threat of harm to himself or others. While Dr. Stastny's affidavit might therefore raise a genuine issue of material fact if the court were examining whether plaintiff was in fact dangerous, i.e., whether a constitutional violation occurred, it does not do so on the issue of whether it was objectively reasonable for defendants to have found him dangerous, even if that finding violated the Constitution. Plaintiff has not suggested that universally accepted guidelines on these matters exist, nor are the courts in a position to create such guidelines. Rather, the court's task at this stage is to examine the undisputed facts of plaintiff's behavior and the defendants' responses and decide whether that record permits a determination as a matter of law that defendants' finding of dangerousness was objectively reasonable. Several cases in this circuit have done just that.

In *Glass*, cited above, the defendants made many of the same findings that defendants made in this case, including that the plaintiff had been hostile, angry, uncooperative, verbally abusive, uncooperative during examinations, showed impaired judgment and displayed guarded, suspicious, and paranoid behavior. 984 F.2d at 56, 57. The physicians in that case, as here, were aware of the patient's psychiatric history, although admittedly that history appeared to demonstrate a greater propensity toward violence than the undisputed facts in this case, including evidence that the plaintiff had threatened a neighbor with a gun. *See id.* The Second Circuit upheld then Chief Judge Platt's conclusion, on defendants' motion for summary judgment, that the undisputed facts were sufficient to conclude that the confinement was objectively reasonable.

In *Rodriguez*, the defendants determined that the plaintiff was a suicide risk based upon her depressed behavior and other relevant background facts. 861 F.Supp. at 1185.

Plaintiff denied that her actions were extreme enough to result in a conclusion under the statute that she was suicidal. *Id.* at 1179. The undisputed facts revealed that plaintiff cried during interviews with defendants and reported sadness, reduced work performance, and difficulty eating and sleeping, symptoms the expert evidence showed were highly correlated with suicide. *Id.* at 1185. Moreover, the plaintiff had originally gone to the hospital "to obtain sleeping pills, something that could be used to commit suicide." *Id.*[12] The court held that, on these facts, the defendants' conclusion that the plaintiff was a danger to herself was objectively reasonable and qualified immunity was appropriate. *Id.* at 1185.[13]

Finally, Judge Platt again addressed the qualified immunity issue in *Richardson v. Nassau County Medical Ctr.*, 840 F.Supp. 219 (E.D.N.Y.1994). As he had in *Glass*, he held in the *Richardson* case that qualified immunity was appropriate where defendants applied the mental hygiene law and reached the objectively reasonable conclusion that the plaintiff was dangerous. *Id.* at 221–222. In that case, the defendants found the plaintiff, who had been carrying knives "for his protection," to be "paranoid," "delusional" and "dangerous." *Id.*

In the face of this authority, plaintiff resists summary judgment on the grounds that (1) the cases cited are inapposite because, unlike here, the plaintiffs did not seek discovery; and (2) qualified immunity is least appropriate when evaluating psychiatric judgments that result in involuntary confinement. *See* Pl.'s Mem. of Law, at 26, 27. The first argument carries little weight, particularly in light of the Supreme Court's pronouncement that pre-discovery summary judgment on the qualified immunity question is often appropriate. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As reviewed below, the factual record before the court on the present motion is ample to make as informed a determination as those made by the courts in the decisions

---

**12.** Note that another interpretation would have been equally viable: that the plaintiff simply wanted sleeping pills to help her get some sleep.

**13.** The court made this determination in addition to holding, as discussed above, that the plaintiff had failed to establish procedural and substantive due process violations as a matter of law.

discussed above. That plaintiff has requested discovery is not, in itself, a material distinguishing factor. Second, the allegation that this action presents the least appropriate case for qualified immunity is drawn not from any case law, but from the affidavit of the attorney who represented plaintiff during his confinement. Darrow Affid., ¶ 8. Neither argument is persuasive.

Similarly unhelpful are the affidavits of Mr. Coyle and Ms. Darrow proffered by plaintiff. This conclusion is not based upon any judgment that the affiants are unworthy of belief,[14] but because the affidavits do no more than provide different subjective interpretations of plaintiff's behavior and alternative evaluations of defendants' decision after the fact. A court's decision on the qualified immunity issue, however, is based not on hindsight, but on whether defendants' actions were *objectively reasonable at the time each examined plaintiff. See Glass,* 984 F.2d at 57.

Thus, the analysis turns to an examination whether, based upon the undisputed facts regarding plaintiff's behavior and known history, an objectively reasonable physician would have responded as defendants did. Because of his earlier visits, doctors and nurses at the NCMC were familiar with plaintiff, his complaints, his history of drug use and previous hospitalization in a psychiatric hospital. Demarco Affid., ¶ 10, 12, 22; Def.'s Mem. of Law, at 7. Plaintiff acknowledges that he believed someone was trying to poison him, Demarco Affid., ¶¶ 7, 19; Def.'s Mem. of Law, at 5, which could have reasonably provided defendants with concern that plaintiff might have a specific target of potential hostility in mind. Plaintiff admits, at least, that he was frustrated, angry, and in an uncooperative mood when he arrived at the hospital. Demarco Affid., ¶ 12. Further, it was necessary for four security guards to subdue plaintiff and place him in four point restraints, and for hospital staff to medicate him. Demarco Affid., ¶¶ 12, 13; Def.'s Mem, of Law, at 6. Dr. Sadiker found him uncontrollable, unpredictable, and potentially dan-

gerous to himself and others. Hingerton Affid., Ex. B, at 6–9, 11–12. A nurse found in plaintiff's possession, several objects which appeared to be self-fashioned spikes or nails, Demarco Affid., ¶ 18; Def.'s Mem. of Law, at 7, which reasonably could have suggested to defendants a potential weapon, even if it was later revealed that the objects were spark plugs.

Plaintiff further admits that he appeared agitated during his interview with Dr. Ohson, that he "mentioned" that Dr. Ohson was collaborating with police to entrap him, that he told Dr. Ohson that he had been intentionally served undercooked chicken, that he threatened to sue Dr. Ohson for wrongful confinement, and that he walked out of the interview. Demarco Affid., ¶ 20. Plaintiff also does not dispute that he told Ohson that, "I used to be a very dangerous man," or that Ohson concluded and recorded that he was "threatening" and "potentially assaultive," Hingerton Affid., Ex. B, at 26. Finally, plaintiff does not dispute the validity of the pages and pages of progress notes in which various nurses and doctors found him threatening, menacing, agitated, verbally abusive, uncooperative and paranoid. Hingerton Affid., Ex. B, at 25–32. Taking all of these facts together and assessing them in light of the relevant case law discussed above, this court concludes that it was objectively reasonable for defendants Sadiker and Ohson to have found plaintiff dangerous. This being the case, no triable issue of fact exists; summary judgment is granted accordingly in favor of defendants Sadiker and Ohson on the basis of qualified immunity.

### B. *Dr. Paiz*

■ Plaintiff has sufficiently demonstrated that summary judgment in favor of Dr. Paiz on the qualified immunity issue is premature absent further discovery. As explained above, both the substantive and procedural due process claims against Dr. Paiz survive the motion for summary judgment for failure to state a colorable constitutional claim. Defendants conceded at oral argu-

---

**14.** Defendants argue that Ms. Darrow, as the lawyer who represented plaintiff during his twenty-one day confinement, is not disinterested, and that Mr. Coyle, another of plaintiff's attorneys, merely summarizes the case.

ment that it would have been objectively unreasonable for Dr. Paiz not to have personally examined plaintiff before admitting him to PPC. Tr. at 9–10. Because it remains a disputed fact whether Dr. Paiz complied with the statute by personally examining plaintiff, it cannot be determined whether it was objectively reasonable for him to believe that he complied with the statute. The procedural due process claim will therefore remain open pending discovery. The substantive due process claim also remains open, because it cannot be determined whether it was objectively reasonable for Dr. Paiz to conclude that plaintiff was dangerous until it is known how Dr. Paiz reached that conclusion. It should be noted, however, that because plaintiff's behavior upon examination by Drs. Sadiker and Ohson was sufficient to convince an objectively reasonable official that he was dangerous, it is unlikely that his behavior during the period between those two examinations will lead to a different conclusion.

## IV. *False Imprisonment*

 Plaintiff alleges two counts of false imprisonment. To satisfy the state law elements of false imprisonment, plaintiff must show that: (1) defendants intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. *Rubenstein v. Benedictine Hosp.*, 790 F.Supp. 396, 409 (N.D.N.Y.1992); *Broughton v. State*, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 314, 373 N.Y.S.2d 87, 93 (N.Y.), *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). If defendants complied with the involuntary commitment provisions of the Mental Health Law, their actions were privileged, and the false imprisonment claim cannot be maintained. *Rubenstein*, 790 F.Supp. at 410. Further, as quoted from N.Y.Jur.2d by Judge Platt, "[no] liability for false imprisonment can grow out of a legally accomplished commitment to a mental hospital or detention for a mental examination, even though the patient is found sane." *Matin v. Brunswick Hosp.*, No. 93 Civ. 1431 (TCP), at 5 (E.D.N.Y. March 22, 1994) (unpublished and unavailable on Lexis/Westlaw). Because there is no genuine issue of material fact

with respect to the statutory compliance of defendants Sadiker and Ohson, the confinement was privileged. The false imprisonment claims against those defendants must therefore be dismissed as well. The false imprisonment claim against defendant Paiz will remain at this time pending further discovery.

## V. *Expungement of Psychiatric Records: Dr. Iafrate*

 Plaintiff seeks expungement of his psychiatric records in connection with this allegedly unlawful confinement, and has therefore included Dr. Iafrate, Executive Director of PPC, as a defendant in this action solely with respect to this prayer for injunctive relief. Pl.'s Mem. of Law in Opp'n, at 7–8. Regardless of the availability of this relief in other jurisdictions, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental Hygiene of New York*, 49 N.Y.2d 947, 406 N.E.2d 800, 428 N.Y.S.2d 945 (N.Y.1980); *Palmer v. New York State Dep't of Mental Hygiene*, 44 N.Y.2d 958, 380 N.E.2d 154, 408 N.Y.S.2d 322 (N.Y.1978). In response to these decisions by the Court of Appeals, the state legislature passed M.H.L. § 33.14, which allows only for the sealing of psychiatric records after a medically certified confinement, provided certain conditions are met. Plaintiff would be entitled to sealing by demonstrating that (1) he is not currently suffering from a mental illness; (2) he has not received in-patient services for a period of three years; and (3) the plaintiff's interests and those of society would best be served by sealing the records. M.H.L. § 33.14(a)(1)(b); *Smith v. Butler Hosp.*, 144 Misc.2d 554, 544 N.Y.S.2d 711 (Sup.Ct.1989). In the alternative, plaintiff may be entitled to sealing if he "was illegally detained by a facility by reason of fraud, error or falsified documents, and the records pertain to such illegal detention." M.H.L. § 33.14(a)(1)(a). Sealing is achieved by commencing "a special proceeding in the supreme court." M.H.L. § 33.14(a)(1).

 Even if the court converts plaintiff's request for expungement into a request for

sealing, the motion to dismiss Dr. Iafrate as a defendant is granted. The provision pursuant to which plaintiff may seek the sealing of his records requires a "special proceeding," which is provided for and defined in the N.Y. C.P.L.R. §§ 103(b) and 105(b), and specifically lays venue in the "supreme court," i.e., the Supreme Court of the State of New York. Thus, it appears that this court lacks jurisdiction to grant the requested relief. Therefore, Dr. Iafrate's motion to dismiss is granted, without prejudice to bringing the appropriate state court action.

### CONCLUSION AND ORDER

For the reasons explained above, summary judgment is GRANTED in favor of defendants Sadiker, Ohson and Iafrate on all claims; judgment will be entered accordingly. Summary judgment with respect to defendant Paiz is DENIED at this time pursuant to Rule 56(f), with leave to renew at the close of discovery. The case is referred to the Magistrate Judge to conduct limited discovery regarding whether defendant Paiz examined plaintiff.

SO ORDERED.